IN RE INTEREST OF DYLAN Z.,
A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE,
V. ROY T., APPELLANT.
697 N.W.2d 707

Filed June 7, 2005.   No. A-04-722.

Susan M. Bazis, of Bazis Law Offices, P.C., L.L.O., for appellant.

Stuart J. Dornan, Douglas County Attorney, Kim B. Hawekotte, and Emily Beller, Senior Certified Law Student, for appellee.

INBODY, Chief Judge, and IRWIN and SIEVERS, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Roy T. appeals from an order of the separate juvenile court of Douglas County adjudicating his son, Dylan Z., to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002) and terminating Roy's parental rights pursuant to Neb. Rev. Stat. § 43-292 (Reissue 2004). On appeal, Roy asserts the juvenile

court erred in finding that he had abandoned Dylan, that he had neglected Dylan, that Dylan had been in an out-of-home placement for 15 or more of the most recent 22 months, and that Dylan's best interests would be served by terminating Roy's parental rights. Roy challenges each of these findings primarily by arguing that he was not aware Dylan was his child until the State's petition in this case was filed and that the State failed to make reasonable efforts to contact him about Dylan. We find that the juvenile court did not err in adjudicating Dylan to be within the meaning of § 43-247(3)(a), and we affirm that portion of the juvenile court's order. We find the court erred in terminating Roy's parental rights based upon a finding that Roy intentionally abandoned or neglected Dylan or that Dylan has been in an out-of-home placement for 15 or more of the most recent 22 months, because the record does not indicate that Roy was aware that Dylan was his child. We also find that the record does not support the court's finding that termination of Roy's parental rights would be in Dylan's best interests.

## II. BACKGROUND

### 1. Background Concerning Dylan's Mother

Dylan was born July 17, 2002. At birth, Dylan tested positive for amphetamines. As a result, the State immediately intervened for Dylan's safety and, on July 18, filed a motion for temporary custody. The court granted temporary custody of Dylan to the Nebraska Department of Health and Human Services (DHHS) the same day. Also on July 18, the State filed a petition against Dylan's mother, alleging that Dylan came within the meaning of § 43-247(3)(a) because Dylan's mother's "use of alcohol and/or controlled substances, [placed Dylan] at risk for harm." On August 23, the juvenile court adjudicated Dylan to be within the meaning of § 43-247(3)(a).

The record indicates that Dylan was placed in foster care in July 2002. Dylan has remained in the same foster home from that time through the pendency of these proceedings.

On July 7, 2003, the State filed a motion seeking to terminate the parental rights of Dylan's mother. The State sought such termination based on allegations that Dylan's mother had both abandoned and neglected him and that termination of her parental

rights was in Dylan's best interests. The juvenile court terminated Dylan's mother's parental rights on September 4, 2003.

## 2. BACKGROUND CONCERNING ROY

Dylan's mother completed an affidavit of paternity on August 22, 2002, in which she indicated that Roy was Dylan's father. The DHHS protection safety worker who was assigned to this case testified that on or about August 22, she attempted to contact Roy by calling a telephone number provided by Dylan's mother in the affidavit of paternity. The protection safety worker testified that she spoke to a woman who identified herself as Roy's mother and that she left a message and telephone number with the woman, which message indicated that Roy was Dylan's father and that Roy should call the protection safety worker. The protection safety worker testified that in December 2002, she called the same telephone number again, that she spoke with a woman who identified herself as Roy's sister, and that Roy was again unavailable.

At trial, Roy presented testimony indicating that the telephone number provided to the protection safety worker by Dylan's mother was not correct. Specifically, the testimony indicated that the telephone number provided had been for Roy's mother's residence and that her telephone number had been changed several months prior to August 2002. Roy's mother testified that she changed telephone companies and that calls to her former telephone number were not forwarded to her new telephone number.

On February 10, 2004, the State filed a supplemental petition against Roy. In the petition, the State sought to have the court adjudicate Dylan as being within the meaning of § 43-247(3)(a) because of Roy's failure to have contact with Dylan, failure to provide financial support for Dylan, and failure "to put himself in a position to exercise proper parental care for [Dylan]." The State also sought to have Roy's parental rights terminated based on abandonment and neglect. On March 1, the State filed an amended supplemental petition in which the State added an allegation that termination of Roy's parental rights was warranted because Dylan had been in an out-of-home placement for 15 or more of the most recent 22 months. On June 8, the juvenile court adjudicated Dylan to be within the meaning of § 43-247(3)(a) and terminated Roy's parental rights.

### 3. Trial Testimony

#### (a) Roy's Contact with Dylan and DHHS

The record indicates that Roy contacted DHHS after being served with the supplemental petition. Roy testified that he was unaware that Dylan was his child until he was served with the petition in this case. The protection safety worker testified that Roy informed her that he had never received the messages she claimed to have left for him. Roy testified that he was aware that Dylan's mother had given birth to a child and that the State had taken custody of the child immediately. Roy testified that he contacted a relative of Dylan's mother and inquired whether Dylan was his child but that he was specifically told that Dylan was not his child. Roy testified that he requested visitation with Dylan but that DHHS denied his request.

At trial, the State presented evidence indicating that Roy had never had any contact with Dylan and had never provided any support for Dylan. Roy presented evidence indicating that he was unaware Dylan was his child and that immediately upon being notified Dylan was his child, he contacted DHHS and sought but was denied visitation. The record indicates that the protection safety worker alleged to have twice called a telephone number provided by Dylan's mother and left messages for Roy, but that the protection safety worker never attempted to visit Roy and never attempted to contact Roy by mail. Although the record indicates that only a partial address was provided to the protection safety worker, she testified that she looked in a telephone book to determine the full address. Additionally, the record indicates that in April 2003, the protection safety worker was aware Roy was incarcerated, but that she made no attempt to contact Roy during his incarceration. The protection safety worker testified at trial that she had never had any personal contact with Roy other than speaking to Roy on the telephone on the occasion when Roy called her after being served with the petition. The protection safety worker further acknowledged that Roy had called and left messages with her office seeking visitation with Dylan but that DHHS had "not allowed him to have visits with Dylan."

## (b) Dylan's Best Interests

The protection safety worker testified that termination of Roy's parental rights was in Dylan's best interests. She testified that her opinion on Dylan's best interests was based upon four factors: Dylan's "special needs," the amount of time that Dylan had been in the same foster home, Roy's "living conditions," and a previous incident occurring with another child of Dylan's mother while residing with Roy.

### (i) Dylan's Special Needs

The record indicates that after Dylan's birth, he had special needs because of his mother's drug use during pregnancy. However, the testimony indicated that at the time of trial, Dylan had no particular special needs other than perhaps asthma. Roy testified that he had cared for a nephew with asthma. In addition, the protection safety worker acknowledged that she had never discussed any of Dylan's needs with Roy and had never investigated Roy's ability to provide for Dylan's "special needs." Specifically, the protection safety worker testified that she had never talked to Roy "at any great length" about Dylan's needs, that she had not explored with Roy what would be required to care for Dylan, and that she had not performed any evaluations to determine whether Roy could handle Dylan's needs. Roy testified that in order to care for Dylan, Roy is willing to learn and understand whatever needs Dylan might have.

### (ii) Dylan's Foster Home

As noted above, the record indicates that Dylan was placed in foster care in July 2002. Dylan has remained in the same foster care from that time throughout the pendency of these proceedings. The evidence presented at trial indicates that the foster home is a suitable placement and that Dylan receives appropriate care in the foster home.

### (iii) Roy's Living Conditions

The record indicates that Roy was living with his mother at the time of trial. The protection safety worker acknowledged that she had never visited the home or otherwise investigated Roy's living conditions, other than to note that he did not have "independent"

housing. There was no evidence presented concerning the quality, size, or location of Roy's home.

### (iv) Previous Incident

The record does not contain much information concerning the previous incident involving the other child of Dylan's mother while the child and Dylan's mother were residing with Roy. The record indicates that Roy owned a "pit bull" terrier and that the pit bull bit the child and "removed" portions of the child's genitalia. The record does not indicate whether Roy was present during the incident or what happened to lead to the incident, but does indicate that Roy was convicted and incarcerated on a charge of harboring a dangerous animal. The record also indicates that the child was not Roy's.

## III. ASSIGNMENTS OF ERROR

On appeal, Roy has assigned numerous errors, which we consolidate for discussion to six. First, Roy asserts that the juvenile court erred in adjudicating Dylan to be within the meaning of § 43-247(3)(a). Second, Roy asserts that the juvenile court erred in finding that he had abandoned Dylan pursuant to § 43-292(1). Third, Roy asserts that the juvenile court erred in finding that he had neglected Dylan pursuant to § 43-292(2). Fourth, Roy asserts that the juvenile court erred in finding that Dylan had been in an out-of-home placement for 15 or more of the most recent 22 months, pursuant to § 43-292(7). Fifth, Roy asserts that the juvenile court erred in finding that termination of his parental rights was in Dylan's best interests. Sixth, Roy asserts that the juvenile court erred in allowing testimony concerning the previous incident involving the other child of Dylan's mother.

## IV. ANALYSIS

### 1. STANDARD OF REVIEW

In an appeal from an order terminating parental rights, an appellate court tries factual questions de novo on the record. Appellate review is independent of the juvenile court's findings. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004); *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004). However, when the evidence is in conflict, an appellate court may give weight to the

fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id.* In reviewing questions of law arising under the Nebraska Juvenile Code, an appellate court reaches conclusions independent of the lower court's ruling. *In re Interest of Mainor T. & Estela T., supra.*

## 2. ADJUDICATION

Roy first asserts that the juvenile court erred in finding that Dylan was within the meaning of § 43-247(3)(a). Our de novo review of the record leads us to conclude that the juvenile court did not err in finding that the State had proven by a preponderance of the evidence that Dylan was abandoned for purposes of § 43-247(3)(a).

In the amended supplemental petition filed against Roy, the State alleged that Dylan came within the meaning of § 43-247(3)(a) because Roy had had no contact with Dylan and had not provided any emotional support for a period in excess of 6 months, had failed to provide Dylan with financial support for a period in excess of 6 months, and had failed to put himself in a position to exercise proper parental care for Dylan. The juvenile court found that the State had proven these allegations by a preponderance of the evidence.

Section 43-247 states:

> The juvenile court in each county as herein provided shall have jurisdiction of:
>
> . . . .
>
> (3) Any juvenile (a) . . . who is abandoned by his or her parent, guardian, or custodian; who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile . . . .

It appears from the amended supplemental petition and the juvenile court's findings that the court adjudicated Dylan on the basis that he is an abandoned child and also on the basis that he lacks proper parental support and parental care. See *In re Interest of Monique H.*, 12 Neb. App. 612, 681 N.W.2d 423 (2004). This court has previously recognized that in family law,

the terms "abandoned" and "abandonment" can include many forms of child neglect, and the lines of distinction between the two are not always clear, so that failure to support or care for a child may sometimes be characterized as abandoning a child and sometimes be characterized as neglect. *Id.*

The rights of the parent and the child are protected separately by the adjudication and dispositional phases of juvenile proceedings. See *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996). Allegations in a petition brought under § 43-247(3)(a) are brought on behalf of the child, not to punish the parents. See *In re Interest of Amber G. et al., supra.* The purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Sabrina K.*, 262 Neb. 871, 635 N.W.2d 727 (2001); *In re Interest of Amber G. et al., supra; In re Interest of Monique H., supra; In re Interest of Rebekah T. et al.*, 11 Neb. App. 507, 654 N.W.2d 744 (2002). The parents' rights are determined at the dispositional phase, not at the adjudication phase. *In re Interest of Sabrina K., supra; In re Interest of Monique H., supra; In re Interest of Rebekah T., supra.* Further, the adjudication phase and the termination phase require different burdens of proof—adjudication is based on a preponderance of the evidence, and termination of parental rights is based on clear and convincing evidence. See *In re Interest of Monique H., supra.*

Keeping all of these propositions of law in mind, we conclude that the juvenile court did not err in finding, for purposes of adjudication and the interests of Dylan, that Dylan came within the meaning of § 43-247(3)(a). The evidence indicated that Roy had not had any contact with Dylan; had not provided any support, financial or emotional, for Dylan; and had provided no parental care for Dylan. Roy's assertions that he was not aware Dylan was his child and that his lack of such knowledge explains his failure to contact or provide for Dylan, although pertinent to our consideration of Roy's rights in the termination phase of the proceedings, do not preclude us from concluding that the preponderance of the evidence indicates that Dylan is a child within the meaning of § 43-247(3)(a). In the adjudication phase, the juvenile court's only concern is whether the conditions in which the juvenile finds himself or herself fit within § 43-247. See *In re Interest of Monique H., supra.* As such, we

find that that portion of the juvenile court's order which adjudicated Dylan to be within the meaning of § 43-247(3)(a) should be affirmed.

### 3. TERMINATION OF PARENTAL RIGHTS

The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). See, also, *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005) (parent's interest in accuracy and justice of decision to terminate parental rights is commanding one). The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection. *In re Interest of Mainor T. & Estela T., supra.* State intervention to terminate the parent-child relationship must be accomplished by fundamentally fair procedures meeting the requisites of the Due Process Clause. See *In re Interest of Mainor T. & Estela T., supra.*

In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004). See *In re Interest of Aaron D., supra.* Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proven. *In re Interest of Aaron D., supra; In re Interest of Stacey D. & Shannon D., supra.*

In the instant case, the juvenile court found that the State had proven by clear and convincing evidence the grounds for termination of parental rights specified in § 43-292(1), (2), and (7) and that termination of Roy's parental rights was in the best interests of Dylan. Section 43-292(1) requires a finding that a parent has abandoned the juvenile for 6 months or more immediately prior to the filing of the petition. Section 43-292(2) requires a finding that a parent has substantially and continuously or repeatedly neglected and refused to give the juvenile necessary parental care and protection. Section 43-292(7)

requires a finding that the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. We conclude that the State failed to prove by clear and convincing evidence that Roy's parental rights should be terminated.

### (a) Abandonment

The first statutory ground for the juvenile court's termination of Roy's parental rights was that Roy had abandoned Dylan for 6 months or more immediately prior to the filing of the petition. See § 43-292(1). Because we conclude that the record lacks clear and convincing evidence to support a finding that Roy intentionally abandoned Dylan, we find that the juvenile court erred in finding that this statutory ground was proven.

The crucial time period for purposes of determining whether a parent has intentionally abandoned a child for purposes of § 43-292(1) is determined by counting back 6 months from the date the petition was filed. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). As such, the crucial time period for purposes of determining whether Roy had intentionally abandoned Dylan is the 6 months prior to the filing of the supplemental petition against Roy on February 10, 2004, or the period of time between August 2003 and February 2004.

For purposes of § 43-292(1), abandonment has been described as a parent's *intentionally withholding* from a child, *without just cause or excuse*, the parent's presence, care, love, protection, maintenance, and opportunity for the display of parental affection for the child. *In re Interest of Dustin H. et al.*, 259 Neb. 166, 608 N.W.2d 580 (2000); *In re Interest of Crystal C., supra*; *In re Interest of Andrew M., Jr., & Marceleno M.*, 9 Neb. App. 947, 622 N.W.2d 697 (2001). The question of abandonment is largely one of intent, to be determined in each case from all the facts and circumstances. *In re Interest of Andrew M., Jr., & Marceleno M., supra.* To sustain a finding of abandonment under § 43-292(1), such a finding must be based on clear and convincing evidence that the parent has demonstrated an intention to withhold parental care and maintenance, not on the parent's failure to provide such care and maintenance as a result of impediments which are not attributable to the parent. See *In re Interest of B.J.M. et al.*, 1 Neb. App.

851, 510 N.W.2d 418 (1993) (abandonment not proven where failure to connect with children was due to systematically created series of impediments and not to indifference).

This court has conducted a de novo review of the facts and circumstances of this entire case. The record indicates that Roy and Dylan's mother were no longer together when Dylan was born, that Roy was not present at Dylan's birth, and that Roy was not named on any birth certificate as Dylan's father. The record indicates that Roy was aware that Dylan's mother had been involved with another man approximately 9 or 10 months prior to Dylan's birth, in addition to being involved with Roy. Roy was aware that Dylan's mother had given birth, because he saw a newspaper account of the birth and the fact that the State had taken custody of Dylan. Roy made an effort to determine if he was Dylan's father by contacting a mutual friend who was also a relative of Dylan's mother. That person specifically informed Roy that he was not Dylan's father.

The record indicates that the protection safety worker was aware in August 2002 that Dylan's mother had named Roy as Dylan's father. Between August 2002 and February 2004, when the supplemental petition against Roy was filed, the protection safety worker made approximately two attempts to contact Roy and inform him that Dylan was his child, through attempted telephone calls to a telephone number provided by Dylan's mother. The protection safety worker never spoke to Roy, but claimed to have left messages on both occasions. We note that neither occasion was during the relevant 6 months prior to the filing of the petition; according to the record, the protection safety worker's attempts to reach Roy by telephone were between August and December 2002. Roy presented evidence indicating that the telephone number used by the protection safety worker was not the correct telephone number, that his telephone number had been changed several months prior to the protection safety worker's first attempt to contact him, and that he was entirely unaware that he was Dylan's father until February 2004 when he was served with the supplemental petition. The protection safety worker never attempted to contact Roy by mail or personal visit at the location she had been informed he was living, nor did she attempt to contact Roy during a period of time when she was

aware that he was incarcerated in Omaha. When Roy was served with the supplemental petition, he immediately demonstrated an interest in Dylan by contacting the protection safety worker and requesting visitation. DHHS denied Roy's request to have contact with Dylan.

The record presented to this court does not contain clear and convincing evidence that Roy intentionally abandoned Dylan. Rather, the record indicates that Roy's lack of contact with Dylan was directly attributable to Roy's lack of knowledge that he was Dylan's father. Although Roy had no contact with Dylan, there was no evidence presented indicating that such lack of contact was intentional. In fact, the record further demonstrates that DHHS and the protection safety worker made no attempts to contact Roy in the relevant 6-month time period prior to filing the supplemental petition against Roy. As such, we conclude that Roy's failure to connect with Dylan during the requisite time period was due to just cause and excuse and not to indifference or intentional abandonment. See *In re Interest of B.J.M. et al.*, 1 Neb. App. 851, 510 N.W.2d 418 (1993). The juvenile court erred in finding that this statutory ground for termination of Roy's parental rights was proven by clear and convincing evidence.

## (b) Neglect

The second statutory ground for the juvenile court's termination of Roy's parental rights was that Roy had substantially and continuously or repeatedly neglected and refused to give Dylan necessary parental care and protection. See § 43-292(2). Because we conclude that the record lacks clear and convincing evidence to support a finding that Roy intentionally neglected Dylan, we find that the juvenile court erred in finding that this statutory ground was proven.

As noted above, the record in this case fails to demonstrate by clear and convincing evidence that Roy's failure to parent Dylan was the result of indifference or intention on Roy's part to abandon or neglect Dylan. Rather, the record indicates that Roy was unaware Dylan was his child, that minimal efforts of DHHS to contact Roy were unsuccessful, and that Roy made attempts to contact DHHS and secure visitation with Dylan immediately upon being served with the supplemental petition. The record does not support a finding by clear and convincing evidence that

Roy refused to give Dylan necessary parental care and protection. The juvenile court erred in finding that this statutory ground for termination of Roy's parental rights was proven by clear and convincing evidence.

### (c) Out-of-Home Placement

The last statutory ground for the juvenile court's termination of Roy's parental rights was that Dylan has been in an out-of-home placement for 15 or more of the most recent 22 months. See § 43-292(7). Because we conclude that it would be fundamentally unfair to attribute the period of Dylan's out-of-home placement to Roy on the facts of this case, we find that the juvenile court erred in finding that this statutory ground was proven.

Our research has revealed no cases, and the State has cited us to none, where § 43-292(7) was used as a ground for termination of parental rights in a situation such as the present one where the parent was unaware that the child at issue was his child. Although we recognize that the plain language of § 43-292(7) provides for termination of parental rights when the juvenile has been in an out-of-home placement for 15 or more of the most recent 22 months, we are also cognizant that there is abundant Nebraska case law indicating that proceedings to terminate parental rights must comport with fundamental fairness. See, e.g., *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004); *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003).

In *In re Interest of K.M.S.*, 236 Neb. 665, 463 N.W.2d 586 (1990), the Nebraska Supreme Court noted that proceedings to terminate parental rights must employ fundamentally fair procedures. In that case, the State sought to terminate the parental rights of a juvenile's biological father. Although the father alleged that he had been unaware that he had any parental rights in the child, the record indicated that he was aware he was the child's biological father, that he had been present at the child's birth, and that the father had spoken with legal counsel about securing parental rights. The Supreme Court, sua sponte, addressed whether the father had been afforded due process where he was not made a party to the initial proceedings to adjudicate the juvenile. The Supreme Court found no due process violation.

In the present case, we conclude that it would be fundamentally unfair to allow Roy's parental rights to be terminated based on Dylan's having been in an out-of-home placement for 15 or more of the most recent 22 months when the record fails to indicate that Roy was aware that Dylan is his child. Although Dylan has been in an out-of-home placement for the requisite period of time, it would be fundamentally unfair to charge that time period against Roy prior to his knowledge that Dylan is his child. As such, we find that the juvenile court erred in finding that this statutory ground for termination of Roy's parental rights was proven.

### (d) Best Interests

Roy also asserts that the juvenile court erred in finding that termination of his parental rights was in Dylan's best interests. In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004). We conclude that the record does not support a finding by clear and convincing evidence that termination of Roy's parental rights is in Dylan's best interests.

The only evidence suggesting that termination of Roy's parental rights would be in Dylan's best interests was provided during the testimony of the protection safety worker. She testified that she "believe[d] it would be in Dylan's best interest[s] for [Roy's] parental rights to be terminated." She testified that her opinion on Dylan's best interests was based upon four factors: Dylan's "special needs," the amount of time that Dylan had been in the same foster home, Roy's "living conditions," and a previous incident occurring with another child of Dylan's mother while residing with Roy. We conclude that the record does not support a finding by clear and convincing evidence that these factors indicate that termination of Roy's parental rights is in Dylan's best interests.

### (i) Dylan's Special Needs

The first factor upon which the protection safety worker based her opinion on best interests is Dylan's "special needs." The record indicates that after Dylan's birth, he had some special needs because of his mother's drug use during pregnancy. However, the testimony indicated that at the time of trial, Dylan had no

particular special needs other than perhaps symptoms similar to asthma.

The State did not present evidence indicating how Dylan's "special needs" made termination of Roy's parental rights in Dylan's best interests. There was no evidence presented indicating that Roy was unable or unwilling to provide for any special needs of Dylan. Rather, the protection safety worker acknowledged that she had never discussed any of Dylan's needs with Roy and had never investigated Roy's ability to provide for Dylan's "special needs." Specifically, the protection safety worker testified that she had never talked to Roy "at any great length" about Dylan's needs, that she had not explored with Roy what would be required to care for Dylan, and that she had not performed any evaluations to determine whether Roy could handle Dylan's needs. Roy testified that in order to care for Dylan, Roy is willing to learn and understand whatever needs Dylan might have, and Roy further testified that he had cared for his nephew who has asthma.

We conclude that the record before us does not support a finding by clear and convincing evidence that Dylan's special needs require termination of Roy's parental rights. The record fails to indicate that Dylan still has significant special needs, fails to indicate that Roy is unable or unwilling to meet any such special needs, and fails to indicate that any investigation was ever made into Roy's ability to provide for any such special needs.

### (ii) Dylan's Foster Home

The second factor upon which the protection safety worker based her opinion on best interests is the amount of time that Dylan has been in his current foster home. As noted above, the record indicates that Dylan was placed in foster care in July 2002. Dylan has remained in the same foster care from that time throughout the pendency of these proceedings. The evidence presented at trial indicates that the foster home is a suitable placement and that Dylan receives appropriate care in the foster home.

Nonetheless, there was no evidence presented indicating why the fact that Dylan has been in one foster home for this length of time makes termination of Roy's parental rights in Dylan's best interests. Indeed, for the same reasons we have concluded that

the record does not support a finding that the statutory grounds for termination of Roy's parental rights exist, we find that the record also does not indicate why Dylan's having been in this foster home while Roy was unaware Dylan was his child supports a finding of best interests. Although it is fortunate that Dylan has been able to be in what appears to be a successful foster care placement, this factor does not support a finding that termination of Roy's parental rights is in Dylan's best interests.

### (iii) Roy's Living Conditions

The third factor upon which the protection safety worker based her opinion on best interests is "[Roy's] living conditions at [the time of trial]." The record indicates that Roy was living with his mother at the time of trial, but reveals nothing else about the suitability of Roy's housing situation. The protection safety worker acknowledged that she had never visited the home or otherwise investigated Roy's living conditions, other than to note that he did not have "independent" housing. There was no evidence presented concerning the quality, size, or location of Roy's home. There was no evidence presented indicating why "independent" housing on Roy's part would be more appropriate than living with relatives, in terms of his parental rights. In short, there was no evidence presented which indicates that Roy's "living conditions" would support terminating his parental rights.

### (iv) Previous Incident

The final factor upon which the protection safety worker based her opinion on best interests is the previous incident involving the other child of Dylan's mother while the child and Dylan's mother were residing with Roy. The record does not contain much information concerning the previous incident. The record indicates that Roy owned a pit bull and that the pit bull bit the child and "removed" portions of the child's genitalia. The record does not indicate whether Roy was present during the incident or what happened to lead to the incident, but does indicate that Roy was convicted and incarcerated on a charge of harboring a dangerous animal. The record also indicates that the child was not Roy's.

Although this prior incident does not weigh in Roy's favor, the record presented also does not support a finding that this incident alone mandates termination of Roy's parental rights. There was

no evidence presented concerning Roy's involvement in the incident. There was no evidence presented to indicate that it was an incident which could or would be likely to happen again. On the record before us, the most that can be said is that this incident was unfortunate and that Roy was criminally punished for owning the dog. Beyond that, however, the record does not support a finding that this incident requires termination of Roy's parental rights.

### (v) Resolution on Best Interests

Our de novo review of the entire record leads us to conclude that the record does not support a finding that termination of Roy's parental rights is in Dylan's best interests at this time. Each of the reasons given by the protection safety worker in support of her opinion that termination of Roy's parental rights would be in Dylan's best interests fails, on the record presented to us, to clearly and convincingly support such a finding. As such, we conclude that the juvenile court erred in finding that termination of Roy's parental rights is in Dylan's best interests.

### 4. RELEVANCY OF PRIOR INCIDENT

Roy's final assignment of error is that the juvenile court erred in overruling his objection to testimony presented by the State concerning the prior incident involving the other child of Dylan's mother when the child and Dylan's mother were residing with Roy. Roy argues on appeal that the testimony was not relevant to determining Dylan's best interests. Roy urges us to not consider the testimony in reviewing this appeal. Inasmuch as we have already concluded that the juvenile court erred in terminating Roy's parental rights, and inasmuch as we have already concluded that the testimony about the prior incident was insufficient to support the best interests determination made by the juvenile court, we need not further address the propriety of this testimony's being admitted or relied upon.

## V. CONCLUSION

We conclude that the State presented sufficient evidence to support a finding by a preponderance of the evidence that Dylan is a child within the meaning of § 43-247(3)(a), and therefore, we affirm the juvenile court's adjudication of Dylan. We conclude that the State failed to present sufficient evidence to support a

finding by clear and convincing evidence that Roy's parental rights should be terminated or that termination of Roy's parental rights is in Dylan's best interests, and therefore, we reverse the juvenile court's termination of Roy's parental rights.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.