IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF JAHMIR O.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF JAHMIR O., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JOSEPH J., APPELLANT.


Filed September 22, 2020.    No. A-20-277.


Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Kenneth Jacobs for appellant.

Natalie Killion, Deputy Douglas County Attorney, and Rachel Lowe, Senior Certified Law Student, for appellee.


MOORE, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Joseph J. appeals the Douglas County Separate Juvenile Court's order terminating his parental rights to his son, Jahmir O. He contends the court erred in terminating his parental rights pursuant to Neb. Rev. Stat. § 43-292(1), (2), and (7) (Reissue 2016); in denying his request for a "negative reasonable efforts" finding; and in finding that termination was in Jahmir's best interests. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

In March 2015, Jahmir was born with drugs in his system, which led to his placement in out-of-home care a few days later. Jahmir has remained in foster care since that time. Jahmir's mother relinquished her parental rights in August 2017 and is not part of this appeal.

In September 2016, Joseph was informed that he might be Jahmir's father and that Joseph would need to complete paternity testing to establish his parental status if he wished to intervene in the case involving Jahmir. Although Joseph indicated that he would set up paternity testing on his own, Joseph did not complete paternity testing until nearly 2 years later in July 2018. In August 2018, paternity testing confirmed Joseph was Jahmir's biological father, and that same month, Joseph filed a motion to intervene in this case.

In January 2019, the State supplemented the adjudication petition to allege that Jahmir came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to Joseph's faults or habits. More specifically, the State alleged Joseph failed to provide proper parental care and support for Jahmir; failed to provide Jahmir with safe, stable housing; and these matters put Jahmir at risk of harm.

In February 2019, the juvenile court entered an order finding that Jahmir came within the meaning of § 43-247(3)(a) because Joseph failed to provide proper parental care and support for Jahmir which put Jahmir at risk of harm, but dismissed the allegation that Joseph failed to provide Jahmir with safe, stable housing due to insufficient evidence. The court also ordered that Joseph was to have "reasonable rights of visitation" as arranged and supervised by DHHS.

### 1. TERMINATION PROCEEDINGS

In November 2019, the State filed a motion to terminate Joseph's parental rights pursuant to § 43-292(1), (2), (7), and (9) and alleged termination was in Jahmir's best interests. Subsequently, Joseph filed a motion for continuing contact with Jahmir if the court terminated Joseph's parental rights. Joseph also filed a request for "negative reasonable efforts" alleging that after the February 2019 adjudication hearing, the court ordered him to have visitation and that he made visitation requests in May, August, and October, but no referrals were made by DHHS; thus, reasonable efforts to preserve and reunify his family were not made.

The termination hearing was held in February 2020. The court received into evidence an affidavit from Amanda Gould, a family permanency specialist assigned to this case; testimony from Darra Boetel, the case manager from October 2019 until the termination hearing; testimony from Machaela Hackendahl, who served as both Jahmir's clinical therapist and Jahmir and Joseph's family therapist; and testimony from Thomas Blankman, Jahmir's foster parent.

### (a) Amanda Gould's Affidavit

Gould attested that Joseph was informed on September 6, 2016, that he could be Jahmir's father and of his right to complete paternity testing and intervene in the case to establish his parental rights. Notwithstanding that notice, Joseph opted not to complete paternity testing for nearly 2 full years prior to undertaking the exam and learning he was Jahmir's biological father. It was only after the 2-year delay that Joseph opted to intervene in the case.

(b) Darra Boetel

Boetel testified that as a caseworker assigned to this case, she facilitated visitation between Joseph and Jahmir. She also provided additional recommendations for Joseph, such as participating in an initial diagnostic interview (IDI) evaluation and a chemical dependency evaluation, to identify and address any needs he may have; however, Joseph did not complete those evaluations.

Boetel acknowledged that Joseph requested visitation in May 2019, but a referral was not made because following Joseph's initial contact, the caseworker was unsuccessful in contacting Joseph in June and July. Joseph made another request for visitation in August 2019 and a referral was made in September 2019. Boetel testified that no visits between Joseph and Jahmir occurred from November 2018 to September 2019 even though visitation referrals had been made to four different agencies. Joseph was unsuccessfully discharged from each agency for lack of engagement.

Boetel testified that to comply with the court's order for visitation, DHHS arranged for therapeutic visits between Joseph and Jahmir but acknowledged therapeutic visits were "over and above" agency-supervised visits because therapeutic visits are arranged around a therapist's schedule and not Joseph's schedule.

Boetel testified that she met with Joseph in November 2019 to explain that Joseph would need to be punctual and consistently attend therapeutic visits in order to reunify with Jahmir. During the meeting, Joseph declined Boetel's offer to provide bus tickets to assist with any transportation issues that might interfere with him attending therapeutic visits, and Joseph did not inquire about Jahmir's well-being. Boetel also testified that during the meeting, Joseph expressed to her that he wanted to change the time for the therapeutic visits, and she learned that Joseph had a history of congestive heart failure. Boetel advised Joseph to contact the therapist and Joseph did so. Boetel testified that after the November 2019 meeting, she attempted to contact Joseph by phone on a monthly basis, but he did not respond. Boetel was only able to speak with Joseph after a court hearing in December 2019 and at a meeting in January 2020.

Boetel testified that based in part on her review of the case file, she was concerned by Joseph's lack of engagement which showed he did not have a relationship with Jahmir, and Joseph lacked consistency in attending therapeutic visits which was necessary to establish a relationship with Jahmir. Boetel further explained that despite having opportunities to interact with Jahmir, Joseph's behavior indicated he was not serious in establishing a relationship with Jahmir. Boetel expressed concerns about Joseph's ability to parent Jahmir due to their lack of a relationship and Joseph being unsuccessfully discharged from four visitation agencies for lack of engagement. Ultimately, Boetel testified that based on these circumstances, terminating Joseph's parental rights was in Jahmir's best interests.

(c) Machaela Hackendahl

Hackendahl testified that, from May 2019 to January 2020, she met with Jahmir weekly for individual therapy. Hackendahl also attempted to facilitate therapeutic visits between Joseph and Jahmir with the goal of building a relationship for potential reunification. The first therapeutic visit was held in November 2019. During this visit, Hackendahl did not observe any interactions

between Joseph and Jahmir; instead, Hackendahl played with Jahmir while Joseph sat at a table. Hackendahl expressed concern over Joseph's behavior which she stated suggested that considerable work would be needed to foster a relationship between Joseph and Jahmir. After this first therapeutic visit, Joseph did not complete any of the three remaining visits due to lack of transportation, illness, and tardiness despite Joseph's awareness that if he arrived more than 15 minutes late to a visit, he would be asked to reschedule. Following three consecutive missed visits and Joseph's failure to reschedule the missed visits, Joseph was unsuccessfully discharged from therapeutic visits pursuant to stated policy which had been explained to Joseph at the start of therapy. Hackendahl testified termination of Joseph's parental rights was in Jahmir's best interests because of Jahmir's current attachment to his foster family and the work necessary to build a positive attachment with Joseph would be "a lengthy process" potentially lasting years.

### (d) Thomas Blankman

Blankman testified he has been Jahmir's foster parent continuously since Jahmir was a few days old. Blankman testified that in 11 months, Joseph has had two visits with Jahmir: a visit in December 2018 and a therapeutic visit in November 2019. Blankman testified that although Joseph sent Jahmir a Christmas present in 2018, Joseph has not sent anything else for Jahmir's care or called to check on Jahmir's well-being and development.

### 2. JUVENILE COURT ORDER

In February 2020, the juvenile court issued an order terminating Joseph's parental rights pursuant to § 43-292(1), (2), and (7), and found that termination was in the best interests of Jahmir. In its order, the court found the testimonies of Boetel, Hackendahl, and Blankman to be credible and discussed Joseph's lack of involvement regarding visitation. The court observed Joseph had been unsuccessfully discharged from four separate visitation agencies for failure to participate in visits with Jahmir and noted that from December 2018 until the termination hearing, the only contact Joseph had with Jahmir was during the November 20, 2019, therapeutic visit. The juvenile court dismissed the allegation of termination pursuant to § 43-292(9) due to insufficient evidence, denied Joseph's motion for continued contact, and denied Joseph's request for a finding of negative reasonable efforts. Joseph has timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

Joseph's assignments of error, consolidated and restated, are that the juvenile court erred: (1) in terminating his parental rights pursuant to § 43-292(1), (2), and (7); (2) in denying his request for a "negative reasonable efforts" finding; and (3) by finding that termination was in Jahmir's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id*.

## V. ANALYSIS

### 1. STATUTORY BASIS

Joseph first contends that the juvenile court erred in terminating his parental rights pursuant to § 43-292(1), (2), and (7).

The State alleged Joseph's parental rights should be terminated pursuant to § 43-292(1), (2), (7), and (9). Ultimately, the juvenile court found termination was supported by three separate statutory grounds: § 43-292(1) (parent has abandoned juvenile for 6 or more months immediately prior to the filing of petition); § 43-292(2) (parent has substantially and continuously or repeatedly neglected and refused to give juvenile necessary parental care and protection); and § 43-292(7) (child out-of-home for 15 or more months of most recent 22 months).

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). We first address Joseph's claim that the juvenile court erred in terminating his parental rights pursuant to § 43-292(7).

Under § 43-292(7), a juvenile court may terminate parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Joseph argues that the 15-month time requirement should not commence to run until January 2019 when the State supplemented the adjudication petition to include allegations against him and the court signed an ex parte order for out-of-home placement regarding Joseph's home. Joseph argues that because only 13 months passed from the January 2019 ex parte order to the February 2020 order terminating his parental rights, the court erred in finding the State met its burden under § 43-292(7).

Joseph's argument is contravened by the Nebraska's Supreme Court's holding in *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006). In *In re Interest of Jagger L.*, the biological father, who was the noncustodial parent, appealed the decision to terminate his parental rights pursuant to § 43-292(7), arguing the juvenile court erred in finding there was sufficient evidence to terminate his rights. *In re Interest of Jagger L., supra.* The facts in that case established that in October 2002, Jagger was removed from his mother's care, placed in temporary custody of DHHS, and remained in foster care through the duration of the proceedings. *Id.* Also in October 2002, Jagger's father, who resided in Florida during the entirety of the proceedings, received a copy of the petition to adjudicate Jagger as to his mother. *Id.* Subsequently, Jagger was adjudicated and his mother's parental rights were terminated. *Id.*

In May 2003, the father intervened in the pending juvenile case. *Id.* In May 2004, a second supplemental petition and motion to terminate the father's parental rights was filed pursuant to § 43-292(1), (2), and (7). *In re Interest of Jagger L., supra.* In January 2005, the juvenile court adjudicated Jagger and terminated the father's parental rights pursuant to § 43-292(1), (2), and (7), also finding that termination was in Jagger's best interests. *In re Interest of Jagger L., supra.* On appeal, the Nebraska Supreme Court determined that termination pursuant to § 43-292(7) was appropriate explaining that from October 2002 to the date of the termination filing in May 2004, Jagger had been in a continuous out-of-home placement for more than 19 months, and from

October 2002 to the date of the juvenile court's termination order in January 2005, Jagger had been in a continuous out-of-home placement for more than 27 months. *In re Interest of Jagger L., supra.*

In the present action, Joseph, who has never had custody of Jahmir, learned in 2016 that there was a possibility that he was Jahmir's father, but he delayed obtaining a paternity test and intervening in the matter for 2 years, until August 2018. By that time, Jahmir, nearly 5 years old, had never lived with his father, and the court entered an order in January 2019 excluding placement of Jahmir with Joseph based upon its finding that placement with Joseph would be contrary to Jahmir's health, safety, or welfare. That is not to say there could never be a circumstance in which a juvenile who has been out-of-home for 15 or more months of the most recent 22 months would always satisfy the dictates of § 43-292(7). For instance, in *In re Interest of Dylan Z.*, 13 Neb. App. 586, 599, 697 N.W.2d 707, 719 (2005), where the evidence supported that the noncustodial father had only recently learned that he was the father of the juvenile, we held:

> Our research has revealed no cases, and the State has cited us to none, where § 43-292(7) was used as a ground for termination of parental rights in a situation such as the present one where the parent was unaware that the child at issue was his child. Although we recognize that the plain language of § 43-292(7) provides for termination of parental rights when the juvenile has been in an out-of-home placement for 15 or more of the most recent 22 months, we are also cognizant that there is abundant Nebraska case law indicating that proceedings to terminate parental rights must comport with fundamental fairness. See, e.g., *In re Interest of Mainor T. & Estela T.,* 267 Neb. 232, 674 N.W.2d 442 (2004); *In re Interest of Rebecka P.,* 266 Neb. 869, 669 N.W.2d 658 (2003).

Assuming without deciding there may be exceptions which militate against strict application of § 43-292(7), this record does not present such a scenario. The record established that at the time the State filed the motion to terminate Joseph's parental rights in January 2019, Jahmir had been in continuous out-of-home placement and care for over 45 months and, by the time the juvenile court terminated Joseph's parental rights in February 2020, Jahmir had been in continuous out-of-home placement and care for over 59 months. Further, the record reflects that Joseph was made aware that Jahmir might be his son as early as 2016 but Joseph waited until 2018 to obtain a paternity test and intervene in this case. Once Joseph did intervene, the court continued out-of-home placement for Jahmir's safety. Under these circumstances, we find the State met its burden of showing Joseph's rights should be terminated pursuant to § 43-292(7).

Because any one ground of the eleven identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child, we need not consider whether termination of Joseph's parental rights was proper pursuant to the subsections (1) and (2) of § 43-292. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

## 2. REASONABLE EFFORTS

Joseph next contends Neb. Rev. Stat. § 43-283.01(2) (Cum. Supp. 2018) requires the State to provide a parent with reasonable efforts to preserve and reunify a family and that the evidence in this case indicates he was not afforded reasonable efforts by DHHS.

Here, the State alleged Joseph's parental rights should be terminated pursuant to § 43-292(1), (2), (7), and (9). Ultimately, the juvenile court found termination was supported by three separate statutory grounds: § 43-292(1), (2), and (7). Reasonable efforts to reunify the family are required only when termination of parental rights is pursued under § 43-292(6). *In re Interest of Mya C. et al.*, 23 Neb. App. 383, 872 N.W.2d 56 (2015). Because the State did not pursue termination under § 43-292(6), reasonable efforts were not required. This assignment of error fails.

### 3. BEST INTERESTS

Joseph's final argument is that the juvenile court erred in finding termination was in Jahmir's best interests when a reasonable alternative existed--that is building a relationship between Joseph and Jahmir.

Before specifically addressing Joseph's assignment, we begin by setting forth the underlying basis for the best interest analysis. In *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 508-09, 933 N.W.2d 873, 887-88 (2019), this court recently stated:

> In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

> The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

> In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

Further, the evidence adduced to prove termination on any statutory ground other than § 43-292(7) is highly relevant to the best interests of the child or children, as it would show abandonment, neglect, unfitness, or abuse. See *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005).

The record reveals that, despite being notified in September 2016, of his potential paternity of Jahmir, the need for paternity testing, and the ability to intervene in this case once paternity was

determined, Joseph did not complete paternity testing until July 2018. After paternity testing confirmed Joseph was Jahmir's father, Joseph intervened in August 2018 and the juvenile court subsequently ordered supervised visitation, which led to family therapy between Joseph and Jahmir. Despite the numerous opportunities provided for Joseph to develop a relationship with his 5-year-old child, Joseph only attended one of the four scheduled family therapy visits and Hackendahl expressed concern that the lack of interaction between Joseph and Jahmir in that visit suggested to her that considerable work would be needed to foster a relationship between Joseph and Jahmir. Further, following Joseph's cancellation of three consecutive visits, combined with his failure to reschedule said visits, he was unsuccessfully discharged from therapeutic visits. Finally, Hackendahl testified that termination of Joseph's parental rights was in Jahmir's best interests because Jahmir was attached to his foster family and building a positive attachment with Joseph would be "a lengthy process" potentially requiring years of work.

These concerns were echoed by Boetel who testified that Joseph's lack of engagement was worrisome because, despite having opportunities to interact with Jahmir, Joseph's behavior suggested he was not serious in establishing a relationship with Jahmir. Although Joseph requested visitation, his repeated failure to communicate with his caseworkers prevented visits from occurring. Further, Joseph failed to complete additional recommendations (such as an IDI and chemical dependency evaluation) made by Boetel to address Joseph's needs. Boetel had concerns about Joseph's ability to parent Jahmir due to his lack of relationship with his son and Joseph being unsuccessfully discharged from four visitation agencies for lack of engagement. Ultimately, Boetel testified that based on these circumstances, terminating Joseph's parental rights would be in Jahmir's best interests.

This record presents a similar factual scenario to that found in *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006). In *In re Interest of Jagger L.*, the State filed a petition in the juvenile court on October 1, 2002, alleging that Jagger was a child within the meaning of § 43-247(3)(a) due to the faults or habits of his mother. On the same day, the court entered an order of temporary custody and Jagger was placed in foster care where he remained for the entirety of the proceedings. The mother's parental rights were eventually terminated in March 2005. The record further demonstrated that the noncustodial father was served with notice of the proceedings on October 22, 2002, but waited until May 2003 to move to have counsel appointed to represent him in the proceedings. In May 2004, the State supplemented its petition to allege that Jagger also lacked parental care by reason of the faults or habits of his father and further requested that the father's parental rights be terminated. The court eventually terminated the father's parental rights finding, *inter alia*, that Jagger's father failed to establish a relationship with Jagger from the time he was notified of the proceeding until June 2004. The father appealed alleging, among other things, that termination was not in Jagger's best interests. In upholding the juvenile court's finding, the Nebraska Supreme Court held:

> [The father] also contends that the State did not prove by clear and convincing evidence that termination of his parental rights was in Jagger's best interests. The evidence in this case establishes that at the time the termination hearing occurred, Jagger had been in out-of-home placement for more than 70 percent of his life. [The father] knew Jagger was in out-of-home placement since October 2002 but had no face-to-face contact with

him until September 2004, 4 months after the motion to terminate parental rights was filed and 24 months after Jagger was placed in foster care. There was evidence that adoption and permanency with his foster family with whom he had bonded would provide Jagger with a happy and healthy life. Given these circumstances and the entire record in this case, which we have reviewed de novo, we conclude that there exists clear and convincing evidence that terminating [the father's] parental rights is in Jagger's best interests. This assigned error is without merit.

*In re Interest of Jagger L.*, 270 Neb. at 836, 708 N.W.2d at 808-09.

The same can be said here. Joseph was notified of the possibility that he was Jahmir's father in September 2016 and of his corresponding right to intervene in the proceedings; however, Joseph neglected to perform paternity testing or intervene for nearly 2 years. Once Joseph did intervene and following an order stating it was not safe to place Jahmir with his father, Joseph failed to participate in an IDI or chemical evaluation, failed to communicate with caseworkers to establish visitation with Jahmir, failed to attend visitations despite referrals made to four different agencies, and in relation to the few visits or therapy sessions Joseph did attend, he was late to arrive and demonstrated a lack of interaction or desire to form a relationship with Jahmir which actions eventually resulted in discharge.

Jahmir has been in foster care since March 2015 and Joseph has demonstrated that he is either unable or unwilling to foster a relationship with his son. Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Accordingly, we find there was clear and convincing evidence to show that Joseph is unfit and that terminating his parental rights was in Jahmir's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Joseph's parental rights.

AFFIRMED.