# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date:   **October 11, 2017**

**No. A-1-CA-35903**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH AND FAMILIES**
**DEPARTMENT,**

     Petitioner-Appellee,

v.

**MICHAEL H.,**

     Respondent-Appellant,

and

**IN THE MATTER OF JAYDA'MAE S.,**

     Child.

**APPEAL FROM THE DISTRICT COURT OF GUADALUPE COUNTY**
**Matthew J. Sandoval, District Judge**

Children, Youth & Families Department
Charles E. Neelley, Chief Children's Court Attorney
Rebecca J. Liggett, Children's Court Attorney
Santa Fe, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Arthur L. Bustos
Las Vegas, NM

Guardian Ad Litem

**OPINION**

**BOHNHOFF, Judge.**

{1} The district court ruled that Appellant Michael H. (Father) had neglected his child (Child) by abandoning her. Father argues that his lack of knowledge that Child's mother, Gina S. (Mother), who had custody of the infant, would neglect her and also his lack of certain knowledge through DNA testing that he in fact was the father of Child negate any conclusion of abandonment under NMSA 1978, Section 32A-4-2(A)(2) (2009, as amended 2016 and 2017), and thus neglect under Section 32A-4-2(F)(1) (current version at Section 32A-4-2(G)(1)). We reject Father's arguments, and therefore affirm.

**BACKGROUND**

{2} Child was born in March 2015. The New Mexico Children, Youth and Families Department (CYFD) took Child into custody on April 11, 2016. CYFD then filed an abuse/neglect petition on April 13, 2016 naming Mother and Father as respondents, and Carlos G. (Husband) as an interested party. Based on information provided by Mother, CYFD alleged that Father is the biological father of Child and that Mother had not been in a relationship or had contact with Father since she was one month pregnant with Child. The petition alleged that Father abused Child as defined in Section 32A-4-2(B)(1) (one "who has suffered or who is at risk of suffering serious

harm because of the action or inaction of the child's parent, guardian or custodian") and Section 32A-4-2(B)(4) (one "whose parent, guardian or custodian has knowingly, intentionally or negligently placed the child in a situation that may endanger the child's life or health"). The petition also alleged that Father neglected Child as defined in Section 32A-4-2(F)(1) (one "who has been abandoned by the child's parent, guardian or custodian") and Section 32A-4-2(F)(2) (one "who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them").

{3}    The district court entered a stipulated order for DNA testing on May 18, 2016. On June 2, 2016, Mother entered a no contest plea to the allegation that she neglected Child under Section 32A-4-2(F)(2). The district court then conducted Father's adjudication hearing on July 7, 2016, during which the following witnesses testified: Mother; Amber Martinez, the CYFD permanency planning worker for Child; and Father.

**I.    Mother's Testimony**

{4}    Mother testified that she had just ended a relationship with another man when she began a sexual relationship with Father. Mother testified that she did not live with

2

Father and that she did not have any relationship with him other than a sexual one. When Mother discovered she was pregnant, she immediately identified Father as the father of Child. Mother told Father she was pregnant with Child, and said that "[Father] believed me, like right away, he was all there for it, saying that, yeah, he was gonna take responsibility."

{5}     When Mother was three months pregnant, she told Father's live-in girlfriend that she was pregnant with Father's child. When Father learned that Mother had told his girlfriend that she was pregnant with Father's baby, Father told Mother that if she retracted the statement and told his girlfriend that her baby was not Father's, then Father would "take care of [her] and the baby." Mother acceded to Father's request and told the girlfriend that someone else was the father, but Mother did not tell anyone else that he was not Child's father. Shortly thereafter, Mother reaffirmed to Father's girlfriend that Father was the father of Child. Mother also received messages from Father's girlfriend acknowledging that Mother was pregnant with Father's child. Mother testified that, after she reaffirmed to Father's girlfriend that Father was the father of her baby, Father "dropped off the face of the earth."

{6}     Father did not provide any support to Mother during her pregnancy. Child was born in Las Vegas, New Mexico; Father was not present at the birth. After Child was born, Mother was told that in order to receive welfare benefits, she had to file a

3

petition for child support from Father. Mother filed the child support petition, but "dropped it" after she married Husband, as she believed Husband "was a better father than [Father]." Mother testified that her only contact with Father since she was three months pregnant had been during a meeting with CYFD after Child was removed from her custody. Father never supported Mother or Child following Child's birth, and Father did not visit Mother to meet Child after Child's birth. The first time Father met Child was when Ms. Martinez brought Child to his home. Other than that one visit, for the first fifteen months of Child's life, Father had no contact with Child.

**II.    CYFD Permanency Planning Worker's Testimony**

{7}    Ms. Martinez testified that she emailed Father on April 28, 2016, regarding Child, and Father called her that day. During that phone call, Father said that he had had sex with Mother one time. Father also told Ms. Martinez that he had a vasectomy two years earlier and so could not be Child's father. The next day, Father called her and stated that after investigating and looking at a timeline, Father did not have a vasectomy two years ago and that Child looked just like his son who was born three months before Child. Ms. Martinez also testified that she had seen Facebook messages in which Mother reported to Father that Child was Father's baby. According to Ms. Martinez, Mother notified Father that Child was his and that after Mother married, Mother told Father that "she didn't . . . need anything from him

4

because her husband was there to step up and be a father to [Child]."

{8} Ms. Martinez testified that she and her supervisor brought Child to Father's home so Father could meet Child. During a family-centered meeting facilitated by CYFD, Father stated that the only reason "he stepped up was because [Child] was in foster care and he didn't want [Child] in foster care." Ms. Martinez testified that Father had not established a relationship or a bond with Child since he had only met Child once before the hearing. Ms. Martinez was also concerned because Father had never provided any financial support to Child.

{9} Ms. Martinez testified that the week before Father's adjudication hearing, Father called her and left a voicemail indicating that he wanted to relinquish his parental rights to Child. Father explained his decision by stating that he did not want to do any parenting classes required by CYFD because he did not feel that he had done anything wrong with respect to Child.

III. Father's Testimony

A. Father's Testimony Regarding When He Had Notice of Mother's Pregnancy With Child

{10} Father testified that he first found out about Child and that he was Child's father when Ms. Martinez emailed him in April 2016, although he did not remember the date. Father, however, also admitted he had notice that Mother was pregnant with his child much earlier than April 2016, when Mother was communicating with both

him and his girlfriend on Facebook about Mother's pregnancy with Child, but that Mother told him Child was not his. Father continued, "She kept . . . trying to argue with us on Facebook, that *she just wanted me to take care of my responsibilities*, and I said that you told me that it wasn't my responsibility because it's not my kid." According to Father, because Mother was trying to argue with him on Facebook, he blocked her, and therefore did not find out about Child until CYFD took Child into its custody. Mother never asked him for anything related to Child, which made him believe that Child was not his, because "if it was my daughter, [Mother] would have pursued [me] as being the dad, not telling me and arguing with my [girlfriend] that it was someone else's, we don't need your money no way."

{11}     Father insisted he had "no idea" Mother was pregnant with his child until CYFD contacted him because he believed someone else could have been the father and because Mother became pregnant "so soon." On cross-examination by Mother's attorney, when asked whether Mother did give him notice that she was pregnant with his child, Father answered, despite his previous denial, "And when I asked her for a DNA test, she did never get back a hold of me, and she kept writing other letters—that I don't need your help, I don't need your money, I don't need this, I don't need that—and we just blocked her from all the pages, and this is the first time I'm hearing about it now."

6

**B.    Father's Other Testimony**

{12}    Father testified that he has eight children including Child, ranging in age from 25 years to Child's age, which was 16 months at the time of the hearing. Father did not have any previous record with CYFD. When Father's counsel asked him if he wanted to provide for his daughter financially, emotionally, and in every way possible, Father responded yes.

{13}    Father admitted that he saw a photograph of his daughter for the first time after he found out where she was (implying foster care), looked on Facebook, found a photograph of Child and said, "Wow, kinda looks like [my son]." Father continued, "[My girlfriend] is the one that said, hey, that's your baby, if it's yours, we're gonna have the DNA test, if it's your kid, we don't want her in foster care. Because [Ms. Martinez] told me the first couple—the family she stayed with, didn't want her for long term. That's what made me push for my kid. I never said, oh, the only reason I want her is because she's in foster care. I wanted her because she's my daughter and I'm a stay at home dad with her brother that's three months older than her." Father also testified that he will "always provide for my kids whether their mothers need me or not."

{14}    Father testified that he felt he was being "bullied" and treated unfairly by CYFD because although he was not in Child's life, that was not his fault, and he

7

could not do everything CYFD was asking him to do with the short notice that CYFD was providing him for some tasks.

## IV. District Court's Decision

{15} At the conclusion of the July 7, 2016 hearing, the district court orally ruled that Father had abandoned Child. The district court also found that Father knew about Child at the beginning of Mother's pregnancy and, significantly, that Mother was more credible than Father. The district court was troubled by Father's expressed desire to relinquish his rights to Child the week before the adjudicatory hearing, stating that it did "not sit well with the [c]ourt." Finally, the district court stated, "fifteen months have gone by, and here we are. And you didn't step forward, [Father], until you were finally tested, and there you are."

{16} The district court entered Father's adjudicatory judgment on July 20, 2016, which stated in relevant part:

> 3. CYFD has proven by clear and convincing evidence that as to [Father], [Child] is a neglected child as follows:
>
>> a. [Child] has been abandoned by her [Father], pursuant to Section 32A-4-2(F)(1).
>
> 4. The [district court made] the following findings and conclusions:
>
>> a. [Father] had knowledge that [Mother] was pregnant and that [Mother] indicated he was the father of [C]hild;

8

b. [Father] did not provide any financial or other support to [Mother] throughout her pregnancy.

c. [Mother] filed a paternity action for child support listing [Father] as the Respondent in 2015.

d. [Father] has not provided any financial support and did not have contact with [C]hild for a period of over three months.

e. [Father] left [Child] in the care of [Mother] where [Child] was neglected.

f. There was no justifiable cause for [Father] leaving [Child] in the care of others without provision for support and without communication for over three months.

**DISCUSSION**

**I. Statutory Framework**

{17} The Children's Code, NMSA 1978, §§ 32A-1-1 to -25-5 (1993, as amended through 2017), contains the Abuse and Neglect Act (the Act), NMSA 1978, §§ 32A-4-1 to -35 (1993, as amended through 2017). The purpose of the Children's Code is:

first to provide for the care, protection and wholesome mental and physical development of children[,] . . . then to preserve the unity of the family whenever possible. A child's health and safety shall be the paramount concern. . . . It is the intent of the [L]egislature that, to the maximum extent possible, children in New Mexico shall be reared as members of a family unit[.]

Section 32A-1-3(A).

{18} The Act defines child abuse, child neglect, and provides the process for the

adjudication of both.[1] Section 32A-4-2(A)(2)(a) defines "abandonment" as follows:

> abandonment includes instances when the parent, *without justifiable cause*: . . . (2) left the child with others, *including the other parent* or an agency, *without provision for support and without communication* for a period of: (a) *three months* if the child was under six years of age at the commencement of the three-month period[.]

(Emphasis added.) (Internal quotation marks omitted.) Section 32A-4-2(F)(1) in turn defines a "neglected child" as a child "who has been abandoned by the child's parent, guardian or custodian[.]"

{19}     Under the Act, a district court holds an adjudication hearing to determine whether a parent abused and/or neglected his or her child. Section 32A-4-20. According to Section 32A-4-20(H), "If the court finds on the basis of . . . clear and convincing evidence, competent, material and relevant in nature, that the child is neglected or abused, the court shall enter an order finding that the child is neglected or abused and may proceed immediately or at a postponed hearing to make disposition of the case." Section 32A-4-20(I) provides for immediate appeal to this

---

[1]The 2009 version of the definitions section of the Act, was in effect at the time the petition was filed as opposed to the 2016 version, which was in effect at the time of the adjudication. The definition of "abandonment" is unchanged, and in both the 2009 and the 2016 versions, it is found at Section 32A-4-2(A). The definition of "neglect" is also unchanged, but has been renumbered from Section 32A-4-2(E)(1) in the 2009 version to Section 32A-4-2(F)(1) in the 2016 version. (In its 2017 session our Legislature amended Section 32A-4-2 again (effective June 16, 2017), so that the definition of neglect is now found at Section 32A-4-2(G).) The district court's adjudicatory judgment cites to the 2016 version, and the parties do so on appeal. We cite to the 2016 version as well.

10

Court of an adjudication determination.[2]

**II. The District Court's Findings Were Supported by Clear and Convincing Evidence and Those Findings Supported the District Court's Determination That Father Had Abandoned and Thus Neglected Child**

{20} Father states that he "challenges Findings of Fact Nos. 4(e) and 4(f) for lack of substantial evidence. As a matter of law, Father [also] challenges whether these findings, even if supported by substantial evidence, support the ultimate finding of neglect." As we understand Father's legal argument, he is contending that his lack of knowledge that Mother would neglect Child while Child was in Mother's care and also lack of certain knowledge based on DNA testing that he was the father of Child amount to justifiable cause that negates any conclusion of abandonment under Section 32A-4-2(A)(2) and thus neglect under Section 32A-4-2(F)(1).

---

[2]Father acknowledges, and CYFD agrees, that Father's notice of appeal from the adjudication judgment was untimely. The district court entered the written adjudicatory judgment finding that Father neglected Child on July 20, 2016. Father filed his notice of appeal appealing the adjudication judgment on September 12, 2016, which was more than thirty days after the order was filed. *See* Rule 12-201(A)(1)(b) NMRA. "We review de novo the question of whether this Court should accept jurisdiction where the notice of appeal from an adjudication of abuse and neglect is filed late." *State ex rel. Children, Youth & Families Dep't v. Amanda M.*, 2006-NMCA-133, ¶ 18, 140 N.M. 578, 144 P.3d 137. A timely notice of appeal "is a mandatory precondition to the exercise of appellate jurisdiction." *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 51, 146 N.M. 286, 209 P.3d 778. However, "it is well settled that failure to timely file a notice of appeal from either an adjudication of abuse or neglect or an order terminating parental rights constitutes ineffective assistance of counsel per se, such that the merits of an appeal will be considered notwithstanding the procedural deficiency." *Id.* Although Father's notice of appeal was untimely, we proceed to the merits.

11

{21} "To meet the standard of proof in an abuse or neglect proceeding, the fact finder must be presented with clear and convincing evidence that the child was abused or neglected." *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 7, 137 N.M. 687, 114 P.3d 367. "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted). "Our standard of review is a narrow one and we may not re-weigh the evidence. Our standard of review is therefore whether, viewing the evidence in the light most favorable to the prevailing party, the fact finder could properly determine that the clear and convincing evidence standard was met." *Id.* (internal quotation marks and citations omitted). Further, "our review is limited to a determination of whether the district court could have found that the parents abused or neglected [the c]hild based upon the evidence before it. We therefore disregard any of the evidence contained in the record that arose after the adjudication of abuse and neglect." *Id.*

{22} Father's challenge to the district court's determination that he had neglected Child by abandonment without justifiable cause requires interpretation of the statutory definition of abandonment. This Court "reviews issues of statutory interpretation de novo." *In re Grace H.*, 2014-NMSC-034, ¶ 34, 335 P.3d 746.

12

**A.** **Substantial Evidence Supports the District Court's Findings That Father (1) Left Child in the Care of Mother (2) Without Provision for Support or Communication, and (3) That Child Was Neglected While in Mother's Care; Substantial Evidence Also Supports the District Court's Finding That Father Was on Notice That He Was the Father of Child**

{23}   Finding 4(e) states: "[Father] left Child in the care of [Mother] where Child was neglected." The three witnesses testified during the adjudication hearing that Father had no contact with Mother after the time she was three months pregnant until the CYFD-facilitated meeting that occurred before the hearing. Mother testified and Father admitted that Father did not support her during her pregnancy. Father further admitted that the first and only time he met his daughter was when she was fifteen months old, about a month before the adjudication hearing, during a visit that was also facilitated by CYFD. Thus, the district court's finding that Father left Child in Mother's care was supported by clear and convincing evidence.

{24}   Further, as stated above, early in this proceeding Mother entered a no contest plea to CYFD's allegation that she had neglected Child. Father does not address the evidence regarding and otherwise does not challenge the underlying finding that Child was neglected while in the care of Mother. "[W]e review substantial evidence claims only if the appellant apprises the Court of all evidence bearing on the issue[.]" *Chavez v. S.E.D. Laboratories*, 2000-NMCA-034, ¶ 26, 128 N.M. 768, 999 P.2d 412, *aff'd in part, rev'd in part*, 2000-NMSC-034, 129 N.M. 794, 134 P.3d 532. Therefore,

13

Father's substantial evidence challenge to Finding 4(e) is rejected.

{25} Finding 4(f) states: "There was no justifiable cause for [Father] leaving [Child] in the care of others without provision for support and communication for over three months. As stated, there also was clear and convincing evidence that, following Child's birth, Father did not support Child or communicate with Child for over three months. The evidence showed that Father did nothing to contact Mother, to provide support to Child, or even to meet Child or inquire as to her well-being. In short, Father did nothing to support or foster any kind of relationship with Child for the first fifteen months of her life, i.e., absent a showing of justifiable cause he abandoned Child as that term is defined in Section 32A-4-2(A)(2). Father testified at the hearing that he would "always provide for my kids whether their mothers need me or not." His actions indicate otherwise. Father did nothing with respect to Child until Ms. Martinez contacted him. Although Mother never reached out to Father again following Child's birth to specifically ask him for support or to introduce Child to him, Father's obligations owed to Child were not contingent upon such action.[3]

{26} Substantial evidence therefore supports the basic factual determinations that

---

[3]Father's actions can be compared with the father's actions in *Benjamin O.*, 2009-NMCA-039, ¶¶ 18-23. In that case, the father did not communicate with his child for five months, and this Court affirmed the district court's finding that he had neglected and abandoned his child. *Id.* ¶ 41-42. Here, Father did not communicate with his child for fifteen months.

14

underlie the district court's Findings 4(e) and 4(f). Father's main challenge in fact is legal: that as a matter of law he cannot be adjudicated to have neglected Child unless he knew that Mother herself had neglected Child and also that, on the basis of DNA testing, he was the father of Child. We address those arguments in the following sections.

{27}     However, because it is material to our analysis, we also note that substantial evidence established that Father was on notice that he was the father of Child. Father and Mother engaged in sexual intercourse. Mother testified that she told Father about her pregnancy by him as soon as she knew about it, and that Father told her he would take responsibility for Child. Mother also testified that Father later told her he would support her during her pregnancy if she would tell Father's girlfriend that Child was not his. Indeed, Father does not challenge the district court's Finding 4(a) that he knew Mother was pregnant and that Mother had identified him as the father of Child. Thus, Father was on notice for several months before Child's birth that he was the father of Child. Further, the fact that Father initially told Mother he would take responsibility for Child amounts to an admission of paternity. The district court specifically stated that it credited Mother's testimony that Father knew he had a child when she was three-months pregnant. As stated above, we do not reweigh this evidence.

**B. Father's Knowledge That Child Would Be Neglected While in Mother's Care**

{28} Father's first challenge to Findings 4(e) and 4(f) focuses not so much on the fact of Mother's neglect of Child while in her care as on the implication that he bears responsibility for that neglect. That is, he argues that for him to be found to have abandoned and thus neglected Child while Child was in the custody of Mother, as a matter of law he "would have to know that Child would be neglected in his absence." He contends that the district court's adjudication was flawed because it "made no findings with regard to any knowledge by Father that Mother would neglect Child or that Child was otherwise in need of his protection." Using the rubric of Section 32A-4-2(A), we understand his position to be that the absence of such knowledge amounts to "justifiable cause" that negates a determination of abandonment. We are not persuaded. Father identifies no case law that supports such a construction of "justifiable cause," and considerable authority supports the conclusion that, on the contrary, Section 32A-4-2(A)(2) imposes an affirmative obligation on a parent to act to ensure that the child is receiving necessary care and support. Mere ignorance is not justifiable cause for the failure to provide support for, and communicate with, the child that is the statutory predicate for a determination of abandonment and thus neglect.

{29} Under the Children's Code, "[a] child's health and safety shall be the

16

paramount concern." Section 32A-1-3(A). Further, without justifiable cause, Section 32A-4-2(A)(2) mandates a finding of abandonment if the parent "[leaves] the child with others, including the other parent or an agency, *without provision for support and without communication*" for a specified period of time. (Emphasis added.) We understand this language ordinarily to require a parent, if he or she does not have custody of the child, to take necessary steps to communicate with the child and otherwise verify that the child is being cared for and supported while in the custody of the other person. Father could not simply assume that Mother was properly caring for Child.

{30}    New Mexico case law buttresses the proposition that a non-custodial parent has a duty to ensure that his or her child is being adequately supported and cared for. In *State ex rel. Children, Youth and Families Department v. Cosme V.*, 2009-NMCA-094, ¶¶ 21, 27, 146 N.M. 809, 215 P.3d 747, this Court concluded that the district court reasonably could have concluded that the non-custodial parent neglected his children when he failed to "take any significant role, much less an active one, in regularly *assuring* that the [c]hildren's well-being and proper needs were met. [The f]ather did very little to fulfill his parental obligations." (Emphasis added.) (Internal quotation marks and citation omitted.) *See also State ex rel. Children, Youth & Families Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 31, 366 P.3d

17

282 ("However, despite [the f]ather's incarceration at the time of the district court's adjudication, he nevertheless had a continuing legal obligation to provide proper care for [the c]hild."); *State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2009-NMCA-039, ¶¶ 18-23, 146 N.M. 60, 206 P.3d 171 (holding father's lack of communication with his child for five months constituted abandonment when the child was living with his sister); *cf. In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶ 22, 132 N.M. 772, 55 P.3d 984 ("A parent's contact with the children and financial support for the children during their absence will weigh against a finding of abandonment.").

{31}     We also reject Father's argument that we should apply to this case our Supreme Court's recent construction of NMSA 1978, Section 30-6-1(B) (2009), which defines "criminal child abandonment" in *State v. Stephenson*, 2017-NMSC-002, ¶¶ 13-17, 389 P.3d 272. Father contends that we should construe Section 32A-4-2(A)(2)'s definition of abandonment in a manner consistent with our Supreme Court's holding that criminal abandonment will be found only where doing so "exposes the child to a risk of harm," and where the abandoning parent is "permanently or temporarily responsible for the custody and control of the child[.]" *Stephenson*, 2017-NMSC-002, ¶ 16. But as CYFD points out, "An abuse and neglect proceeding is not a criminal prosecution." *State ex rel. Children, Youth & Families Dep't v. Michael T.*, 2007-

18

NMCA-163, ¶ 11, 143 N.M. 75, 172 P.3d 1287. Further, the paramount concern of the Children's Code is protecting the health and safety of the child, not punishing conduct that the Legislature has deemed subject to criminal sanction. We therefore do not interpret the definition of abandonment in Section 32A-4-2(A)(2) to incorporate the elements of criminal abandonment under Section 30-6-1(B).

{32} Father was on notice and acknowledged that he was the father of Child. There is no evidence that Father took any steps to check on and ensure Child's well-being while Child was in Mother's care. Under the facts of this case, Father's lack of knowledge of Mother's neglect is not justifiable cause for leaving Child with Mother without provision for support and without communication for a period of three months, i.e., it is no defense to a determination that Father neglected Child by abandoning her.

**C.      Father's Knowledge That He Was Child's Father**

{33} Father also argues that "a man's departure from a child who has not been clearly identified"—in particular, by means of DNA testing—"as his biological child cannot be construed as 'abandonment' for purposes of a petition for neglect." In the context of Section 32A-2-4(A)(2), in challenging Findings 4(e) and 4(f) on this second ground, Father effectively is contending that as a matter of law the absence of DNA testing establishing his paternity constituted "justifiable cause" for not

19

providing for Child's support and for not communicating with her for the first fifteen months of her life. Because there was no such clear and convincing evidence that he had such certain knowledge that he was the father of Child, he urges, the district court's adjudication of neglect on the basis of abandonment was error. Whether a father must have confirmation by DNA test after he is on notice that he has fathered a child before he can be adjudicated to have neglected the child by abandonment is a matter of first impression.

{34}     We conclude that the lack of certainty of paternity is not a defense to an adjudication of neglect by abandonment. That is, such uncertainty will not constitute "justifiable cause" for a man who is otherwise on notice that he may have fathered a child to fail to make provision for support of, and communicate with, the child. Under the facts of this case established by clear and convincing evidence, Father had more than sufficient notice that he was the father of Child to give rise to an affirmative obligation to either provide such support and undertake such communication or, alternatively, take steps to establish he was not the father. If he did neither, Father assumed the risk of an adjudication of neglect.

**1.     Governing Legal Principles**

{35}     This case does not involve a father who had absolutely no knowledge of his child. On the contrary, Father had notice Mother was pregnant with Child and had

20

acknowledged that he was the father. Therefore, although it arose in the context of an adoption proceeding, *Helen G. v. Mark J.H.*, 2008-NMSC-002, 143 N.M. 246, 175 P.3d 914, assists our analysis. There, our Supreme Court considered whether a father, who knew about the mother's pregnancy but did not act to assert paternity until after another couple filed a petition to adopt the child, could be an "acknowledged" father whose consent was required before the adoption could be finalized. *Id.* ¶¶ 2-6; *see* NMSA 1978, §§ 32A-5-3(F) (2012), -17(A)(5) (2005). *Helen G.* indicates that when a father is on notice that he has fathered a child, if he wishes to preserve his rights as parent, he must act diligently and take affirmative action to qualify as an acknowledged father beyond requesting an adjudication of paternity. 2008-NMSC-002, ¶ 32 ("We conclude that a mere biological connection is insufficient to qualify as a presumed or acknowledged father—it is only the initial step toward acknowledged father status." (internal quotation marks omitted)). *Helen G.* rejected the proposition that "the language of the [Adoption] Act evinces a clear intent to be . . . indulgent of fathers who appear to be indifferent to their children." *Id.* ¶ 20. *Helen G.* also distinguished between the father who was on notice of his paternity and the father "who [did] not know or who [had] no reason to know that [he had] fathered a child." *Id.* ¶ 49. We see that difference as instructive.

{36} Father relies on *In re Interest of Dylan Z.*, 697 N.W.2d 707 (Neb. Ct. App.

21

2005). In that case, the Nebraska Court of Appeals determined that there was no clear and convincing evidence that the father intentionally abandoned his child because the father's lack of contact with, and support for, the child "was directly attributable to [the father's] lack of knowledge that he was [the child's] father." *Id.* at 718-19. *See also State ex rel. Office for Servs. to Children & Families v. Rangel*, 927 P.2d 1118, 1120 (Or. Ct. App. 1996) ("[Oregon's termination for abandonment statute] contemplates that a father know of the existence of his child before he can be held to have abandoned the child. . . . [The] father testified under oath that he did not know that he was the father until he was served with the petition to terminate his parental rights."). The key difference between *In re Dylan Z.* and the instant case is that, here, Father had notice he fathered Child. This notice to Father is crucial to our determination that lack of a DNA test does not constitute justifiable cause for leaving Child in Mother's care without support or communication for over three months.

{37}     *In re Adoption of D.M.M.*, 955 P.2d 618 (Kan. Ct. App. 1997), is more factually similar to the case at bar than *In re Dylan Z.* There, the Kansas Court of Appeals affirmed the trial court's finding that the father had failed to support his child's mother for six months prior to the child's birth and that the father's consent to adoption was not required because he had abandoned his child after having knowledge of the child's birth. *Id.* at 621. According to the *In re D.M.M.* court, "After

22

the baby was born, [the father] did nothing but visit two times." *Id.* The trial court found, which the *In re D.M.M.* court approved, "The fact that a man knows only that he was a possible father during the pregnancy does not relieve him from the responsibility to support the mother during the pregnancy." *Id.* (internal quotation marks omitted). The trial court continued, stating that the father "could not just sit back and see what happens until some unknown point in time in the future and do nothing until someone else forces the issue." *Id.* (internal quotation marks and citation omitted). The *In re D.M.M.* court also stated:

> Any man should be aware that he may become the father of a child as a result of having sexual intercourse with a woman, regardless of the number of sexual partners she has. If any of those partners wishes to preserve his parental rights in the event of a later adoption, each one will be required to initiate reasonable efforts toward supporting the mother prior to the child's birth.

*Id.* at 622. This consideration is equally relevant in the context of an adjudication for neglect by abandonment.

{38}    *In re Interest of Chance J.*, 776 N.W.2d 519 (Neb. 2009), also provides useful analysis. There, the Nebraska Supreme Court affirmed the juvenile court's finding that the father had abandoned his child. *Id.* at 522. *In re Chance J.* involved a child who was born to a married couple while the mother was a prostitute. *Id.* The couple had separated by the time the child was born, but the father was present for the child's birth. *Id.* The father testified that, when he saw the infant shortly after his birth, the

23

infant had white skin, blue eyes, and red hair, which was "awkward" because the father was African-American. *Id.* (internal quotation marks and citation omitted). The father testified that the mother stated that the child "must have been a trick's baby[, and that] once he saw [the child], he did not believe that [the child] was his son and made no further effort to try and determine whether he was [the] father." *Id.* (internal quotation marks omitted).

{39} The Nebraska Supreme Court was unpersuaded that the father's suspicions that someone else fathered the child justified the father's abandonment of the child, stating:

> In fact, "just cause or excuse" for a parent's failure to maintain a relationship with a minor child has generally been confined to circumstances that are, at least in part, beyond the control of the parent. But there is nothing in the record in this case indicating that [the father] did not have the means or opportunity to confirm his suspicions that [the child] was not his child, at the hospital, or anytime thereafter. . . . Only after the [s]tate filed a petition to terminate his rights, nearly [three] years after [the child] was born, did [the father] attempt to take any responsibility for [the child]. The obligations of parenthood cannot be set aside that easily, based on nothing more than mere physical appearance or unconfirmed suspicions. We will not set the bar so low for responsible parental involvement.

*Id.* at 527 (footnote omitted).

{40} Here, Child's physical appearance did not suggest that Father was not Child's father. The procedural posture of *In re Chance J.* and the case at bar also differ in certain respects. The *In re Chance J.* court's determination that the father had

24

abandoned the child was based in part on its consideration under Nebraska law that "children born to the parties in a marriage are presumed legitimate until proved otherwise[.]" *Id.* Here, Father and Mother were not married to each other when Child was born. However, the case at bar otherwise has parallels to *In re Chance J.* Like the father in *In re Chance J.*, Father had the means and the opportunity to confirm his suspicion that Child was not his child.[4] Father also did not attempt to take responsibility for Child until after CYFD filed its petition alleging that Father had abandoned Child. We see *In re Chance J.* as instructive for its determination that certainty of knowledge of paternity—in particular, positive DNA testing—is not a condition precedent for a man's obligation to care for a child to arise. *In re Chance J.* indicates that, where a father is in a position to obtain DNA testing, if he has any questions about his paternity then the onus is on him to obtain DNA testing that will

---

[4]Under NMSA 1978, Section 40-11A-602(C) (2009) of the New Mexico Uniform Parentage Act, §§ 40-11A-101 to -903 (2009), a man whose paternity of the child is in question may bring a proceeding to adjudicate parentage, and "the district court shall order the child and other designated persons to submit to genetic testing if the request for testing is supported by the sworn statement of a party to the proceeding: (1) alleging paternity and stating facts establishing a reasonable probability of the requisite sexual contact between the persons; or (2) denying paternity and stating facts establishing a possibility that sexual contact between the persons, if any, did not result in the conception of the child." Section 40-11A-502(A). Father, therefore, could have brought a proceeding to adjudicate his parentage of Child, and if he or Mother had submitted a sworn statement either alleging or denying his paternity, the district court would have been required to order genetic testing. Thus, an alleged or putative father can act to determine his parentage with a DNA test.

25

confirm non-paternity. For these reasons, we reject Father's argument that, as a matter of law, the lack of certain knowledge of paternity by means of DNA testing is justifiable cause that negates a determination of neglect based on abandonment.

**2.      Father's Lack of Certain Knowledge of His Paternity Was Not Justifiable Cause for Abandoning Child**

{41}      Father left Child with Mother without providing for Child's support and without communicating with Child for a period of more than three months. Father's ignorance of Mother's failure to care for Child does not constitute justifiable cause. In addition, under the facts of this case as established by clear and convincing evidence, where Father not only received notice but acknowledged that he was the father of Child, the lack of greater certainty based on DNA testing regarding paternity was not justifiable cause that negates a determination of abandonment. If Father in fact harbored any doubt about Child's paternity, he bore the burden of taking steps to resolve the question.[5] Because Father neither established he was not the father nor provided the necessary care to Child, the district court properly found that he had

---

[5]Father testified that he asked Mother for a DNA test during her pregnancy. This testimony is inconsistent with Father's other testimony that he did not know about Child or that Child was his until April 2016. But even assuming the statement was truthful, Father never followed up on the request. On the contrary, he proceeded to block communication with Mother on social media. For these reasons, we do not conclude that Mother's inaction following Father's claimed request for a DNA test to be justifiable cause for Father leaving Child in the care of others without communication or provision for support.

26

neglected Child based on abandonment. *Cf. Cosme V.*, 2009-NMCA-094, ¶ 34 ("Under certain circumstances, parents cannot demand parental rights without pro-actively fulfilling their obligations as parents to care for their children. [The f]ather did not pro-actively fulfill his obligations . . . over a substantial period of time, and there came a point when [CYFD] appropriately intervened, and sought and obtained a neglect adjudication implicating [the f]ather. The neglect determination as to [the f]ather was based on clear and convincing evidence and was proper." (citation omitted)).[6]

**CONCLUSION**

{42}    We affirm the district court's adjudication of neglect with respect to Father.

{43}    **IT IS SO ORDERED.**

_____
**HENRY M. BOHNHOFF, Judge**

---

[6]Father also argues that he "is not required to submit to assessments or attend parenting classes *unless and until* he has otherwise been found guilty of neglect[,]" and therefore the district court could not take into account Father's actions post-petition when finding that he neglected Child. We need not consider this argument because we hold that there was clear and convincing evidence that Father abandoned Child before CYFD filed its abuse and neglect petition.

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**


_____
**MICHAEL E. VIGIL, Judge**