This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-39481

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

Petitioner-Appellee,

v.

**TIMOTHY T.-L.,**

Respondent-Appellant,

and

**SHANNON F. and ANTHONY M.,**

Intervenors,

**IN THE MATTER OF TAYLA M.,**

Child.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Cristina T. Jaramillo, District Judge**

Children, Youth & Families Department
Mary McQueeney, Acting Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

L. Helen Bennett
Albuquerque, NM
for Intervenors
Nanette E. Erdman
Rio Rancho, NM

Guardian Ad Litem

## DECISION

**BOGARDUS, Judge.**

**{1}**     Timothy T.-L. (Father) appeals the termination of his parental rights to his daughter, Tayla M. (Child). Father contends (1) the district court erred in terminating his parental rights based on NMSA 1978, Section 32A-4-28(B)(1) (2005); (2) there was insufficient evidence to support termination of parental rights on the basis of presumptive abandonment, pursuant to Section 32A-4-28(B)(3), or neglect by abandonment, pursuant to Section 32A-4-28(B)(2); and (3) the Children, Youth and Families Department (the Department) failed to show that it made reasonable efforts to find a suitable relative placement for Child. We vacate the district court's determination that the Department met its burden under Section 32A-4-28(B)(1) but otherwise affirm.

**{2}**     Because this a non-precedential expedited bench decision and the parties are familiar with the facts and procedural posture of this case, our decision includes only those facts and law necessary to decide the merits. *See In re Court of Appeals Caseload*, Misc. Order No. 01-57, ¶ 4(C) (Sept. 19, 2016).

## BACKGROUND

**{3}**     Father is the biological father of Child, born in May 2018. In August 2018, Child was placed in the Department's custody, and the Department filed a Neglect/Abuse Petition. The petition did not name Father, who had not yet been identified, but named Jessica G. (Mother) and Kenneth M. (Custodian), who was in a relationship with Mother and who had stated he planned to be identified as Child's father.[1]

**{4}**     In September 2018 Custodian entered a no contest plea to NMSA 1978, Section 32A-4-2(G)(2) (2018). At Mother's adjudicatory and dispositional hearings held in September and December 2018, the district court found Child abused and neglected under Sections 32A-4-2(B)(1) and (G)(2). At the hearing, Mother testified that Custodian had taken a paternity test, which showed he was not Child's biological father; "Timothy L." was the Child's biological father; and she provided the names "Timothy L." and "Timothy T." to a Department permanency planning worker (PPW).

---

[1]" '[C]ustodian' means an adult with whom the child lives who is not a parent or guardian of the child[.]" NMSA 1978, § 32A-1-4(F) (2019).

**{5}** In September 2019 the Department moved to terminate the parental rights of Mother and Custodian, and in January 2020, the Department moved to amend the Neglect/Abuse Petition, adding Father as a party. The amended petition, filed in February 2020, alleged Father had neglected Child pursuant to Sections 32A-4-2(G)(1) and (G)(2). Father was served with the amended petition that same month and thereafter took a paternity test. Once the test came back indicating he was the biological father, Father said he wished to obtain custody of Child. On February 21, 2020, the Department filed an amended motion for termination of parental rights in which it asked the court to terminate Father's parental rights pursuant to Sections 32A-4-28(B)(l)-(3).

**{6}** In April and May 2020, the district court held Father's adjudicatory hearings. During the April hearing, Department PPW Mikaila Murphy testified about her efforts to locate and contact Father leading up to the filing of the amended petition, as well as her communications with Father after the petition was filed. In June 2020 the district court issued its dispositional judgment and found that Father neglected Child by abandoning her, pursuant to Section 32A-4-2(G)(l). The district court ordered Father to complete the treatment plan proposed by the Department.

**{7}** The district court held Father's TPR trial in September 2020. The court took judicial notice of the findings from Father's adjudicatory hearing, as well as Ms. Murphy's testimony from that hearing. In December 2020 the court terminated Father's parental rights pursuant to Sections 32A-4-28(B)(l)-(3). Father appeals.

## DISCUSSION

### I. Substantial Evidence Supports Termination of Parental Rights

### A. Standard of Review

**{8}** "It is [the Department's] burden to prove the statutory grounds for termination by clear and convincing evidence." *State ex rel. Child., Youth & Fams. Dep't v. Tammy S.*, 1999-NMCA-009, ¶ 13, 126 N.M. 664, 974 P.2d 158. "Clear and convincing evidence means evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Child., Youth & Fams. Dep't v. Nathan H.*, 2016-NMCA-043, ¶ 31, 370 P.3d 782 (internal quotation marks and citation omitted).

**{9}** "This Court will uphold the termination if, viewing the evidence in the light most favorable to the judgment, a fact[-]finder could properly determine that the clear and convincing standard was met." *Tammy S.*, 1999-NMCA-009, ¶ 13. Our standard of review does not require us to determine "whether the [district] court could have reached a different conclusion." *State ex rel. Child., Youth & Fams. Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 31, 132 N.M. 299, 47 P.3d 859. "On appeal, this Court may not reweigh the evidence." *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 3, 120 N.M. 463, 902 P.2d 1066. Further, "our job is not to determine whether [the Department] did everything possible; our task is limited by our statutory scope of review

to whether [the Department] complied with the minimum required under law." *Patricia H.*, 2002-NMCA-061, ¶ 28.

## B. The District Court Erred In Terminating Father's Parental Rights Pursuant to Section 32A-4-28(B)(1)

**{10}** Father argues, and the Department concedes, that the district court erred in terminating Father's parental rights pursuant to Section 32A-4-28(B)(1) because Father was present before the TPR trial and expressed a legitimate desire to take responsibility for Child. Although we are not bound by the Department's concession, *State v. Tapia*, 2015-NMCA-048, ¶ 31, 347 P.3d 738, we accept the concession because we conclude it is supported by our precedent. *See In re Grace H.*, 2014-NMSC-034, ¶ 33, 335 P.3d 746 (explaining that "Section 32A-4-28(B)(1) is to be used in instances when a parent is completely absent prior to termination" and "Section 32A-4-28(B)(2) is to be used where a parent is present and willing to participate some meaningful time prior to termination"). Accordingly, the district court erred in terminating Father's parental rights pursuant to Section 32A-4-28(B)(1). Because, as we discuss, other grounds support termination, this error does not result in reversal of the termination of Father's parental rights.

## C. Clear and Convincing Evidence Supports the District Court's Finding That Father Presumptively Abandoned Child

**{11}** Father argues the district court erred in terminating Father's parental rights on the basis of presumptive abandonment, pursuant to Section 32A-4-28(B)(3). Section 32A-4-28(B)(3) allows termination of parental rights based on presumptive abandonment if:

> (3)     the child has been placed in the care of others, including care by other relatives, either by a court order or otherwise and . . .

> (a)     the child has lived in the home of others for an extended period of time;

> (b)     the parent-child relationship has disintegrated;

> (c)     a psychological parent-child relationship has developed between the substitute family and the child;

> (d)     if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent;

> (e)     the substitute family desires to adopt the child; and (f) a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted.

*Id.*

**{12}** Father argues that "[p]resumptive abandonment . . . does not apply, without a prior showing that Father is unfit[,]" which means that evidence "limited to a showing that the parental bond has disintegrated" is insufficient to support the termination of parental rights. Father cites a decision from this Court, *In re Adoption of J.J.B.*, for the proposition that "termination of parental rights on grounds of the child's interests alone, absent a showing of parental unfitness, fails to satisfy constitutional due process." 1993-NMCA-145, ¶ 34, 117 N.M. 31, 868 P.2d 1256, *aff'd in part, rev'd in part*, 1995-NMSC-026, 119 N.M. 638, 894 P.2d 994. But our Supreme Court later granted certiorari in that case, in which the Court concluded, "[I]f abandonment is established under [the presumptive abandonment statute], no separate showing, finding, or even inquiry concerning fitness or unfitness is necessary." *In re Adoption of J.J.B.*, 1995-NMSC-026, ¶ 41. To the extent Father argues there was not clear and convincing evidence to support termination of parental rights on the basis of presumptive abandonment, this argument is undeveloped and we decline to address it. *See State ex rel. Child., Youth & Fams. Dep't v. Marsalee P.*, 2013-NMCA-062, ¶ 20, 302 P.3d 761 (recognizing that this Court does not review undeveloped arguments); *State ex rel. Child., Youth & Fams. Dep't v. Jerry K.*, 2015-NMCA-047, ¶ 29, 347 P.3d 724 (explaining that "an appellate court will not attempt to guess at what a party's arguments might be" (internal quotation marks and citation omitted)).[2] Accordingly, we conclude clear and convincing evidence supports the district court's termination of Father's parental rights under Section 32A-4-28(B)(3). *See, e.g.*, *State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (stating that there is a presumption of correctness in the rulings of the district court, and the party claiming error bears the burden of showing such error).

**D.      Clear and Convincing Evidence Supports the District Court's Finding That the Department Made Reasonable Efforts to Assist Father in Adjusting the Causes and Conditions of Neglect**

**{13}** Father also argues the Department failed to show it made reasonable efforts to ameliorate the causes and conditions of neglect, pursuant to 32A-4-28(B)(2). Father contends (1) the Department's efforts were passive and limited to referring Father to services; (2) incarceration limited Father's ability to complete his treatment plan, despite his consistently expressed willingness to do so; (3) the Department rejected classes that Father had completed as noncompliant with his treatment plan without explanation; (4) the Department lacked sufficient time to demonstrate reasonable efforts; and (5) there were fundamental problems with the testimony of the Department's expert witness. We are unpersuaded.[3]

**{14}** In order to terminate parental rights with respect to a neglected or abused child, the district court must find that "the conditions and causes of the neglect and abuse are

---

2Although Father challenges various findings underlying the judgment terminating his parental rights, he does not provide arguments specific to these challenges. We therefore do not address these factual challenges. *See Nationstar Mortg. LLC v. O'Malley*, 2018-NMCA-029, ¶ 38, 415 P.3d 1022 ("[W]e will not consider bare assertions that are not developed[.]").

3Father also challenges the adjudicatory finding that Father abandoned Child but does not develop an argument to support this specific challenge. We therefore decline to address it. *Marsalee P.*, 2013-NMCA-062, ¶ 20 (recognizing that this Court does not review unclear or undeveloped arguments).

unlikely to change in the foreseeable future *despite reasonable efforts by the department* . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." Section 32A-4-28(B)(2) (emphases added). "[W]hat constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *State ex rel. Child., Youth & Fams. Dep't v. Keon H.*, 2018-NMSC-033, ¶ 41, 421 P.3d 814 (internal quotation marks and citation omitted). The Department's efforts need only be reasonable, not perfect. *See id.* ¶ 43. Moreover, the Department need not do "everything possible" to assist a parent; instead, the focus is on whether it has done the minimum required by law. *See Patricia H.*, 2002-NMCA-061, ¶ 28.

**{15}**   We conclude the district court could properly determine the Department's efforts were reasonable in light of Father's failure to engage with them. As of the date the district courted ordered Father's treatment plan, Father was incarcerated. As a result, PPW Sara Piro contacted Father's caseworker at the detention facility, as well as another detention facility staff member to verify that the detention center offered programs that would satisfy requirements of Father's treatment plan. Ms. Piro verified the detention center offered services that would satisfy various treatment plan requirements, including parenting, substance abuse, domestic violence, and anger management programs, as well as individual therapy.

**{16}**   Ms. Piro also held meetings by phone with Father at least once per month. During these meetings, Ms. Piro reviewed Father's treatment plan and discussed with Father programs he could complete while in custody. Ms. Piro asked detention center staff to help Father enroll in programs. As to one specialized parenting program, Circle of Security, not offered at the detention facility, Ms. Piro provided Father the program facilitator's phone number and notified Father multiple times of the need to contact the facilitator. In addition, Ms. Piro communicated with Father's caseworker at the detention facility to arrange for the caseworker to contact the program's facilitator. Father completed two programs.

**{17}**   Ms. Piro also mailed the treatment plan and associated parenting worksheets to Father, along with return envelopes to return completed worksheets. Father acknowledged receiving worksheets in the mail. Although Ms. Piro discussed the worksheets Father could complete while incarcerated with Father and emailed copies of the worksheets to Father's caseworker at the facility, Father did not return any worksheets.

**{18}**   Concerning Father's treatment plan requirement to attend Child's non-emergency medical appointments, Ms. Piro testified that it would be possible to attend Child's medical appointments while incarcerated and that she notified Father of Child's medical appointments during their telephonic meetings. Father did not attend any appointments. In all, Ms. Piro testified that Father completed one item on his treatment plan, the psychosocial assessment.

**{19}**     Both the Department and Father were required to make efforts to reunify the family. *See Keon H.*, 2018-NMSC-033, ¶ 48. In *Keon H.*, the department "prepared a treatment plan for [the f]ather, went over the treatment plan with [him], provided [the f]ather with the [d]epartment's contact information, and scheduled appointments for [the f]ather's psychosocial assessment[, but he] did not show up for the appointments and did not participate in the psychosocial assessment." *Id.* ¶ 43. The department then sent the father the psychosocial assessment along with self-addressed, stamped envelopes, which the father returned. *Id.* ¶ 47. But when the department mailed the father a letter detailing the ways he could comply with his treatment plan, the father did not respond. *Id.*  Similarly, here, Father failed to complete various requirements outlined in his treatment plan despite the Department's efforts to connect him with services pertaining to his treatment plan, and failed to return worksheets associated with his treatment plan.

**{20}**     Father argues his incarceration limited his ability to complete his treatment plan and raises questions regarding his access to a phone and the internet. Ms. Piro, however, stated that Father never indicated any difficulty with scheduling meetings with her by phone, and Father directs us to no testimony that he told Ms. Piro he did not have the number to attend Child's medical visits or was unable to access the Circle of Security program due to lack of internet access.

**{21}**     Father next argues that he engaged in his treatment plan by completing an anger management class and parenting class, Partners in Parenting, but that the Department rejected these classes as not complying with Father's treatment plan "without providing any testimony" as to why. Ms. Piro testified, however, that due to Child's "extensive sensory and medical issues[,]" which Partners in Parenting did not address, Father would also need to complete a more specialized parenting class, such as Circle of Security.[4] To the extent Father's testimony conflicts with Ms. Piro's, the district court expressed concerns with Father's credibility, and we defer to the district court's determination. *See Keon H.*, 2018-NMSC-033, ¶ 51 ("It is not our job to assess the credibility of witnesses; it is our duty to defer to the district court's conclusions in this regard.").

**{22}**     Father next argues the Department did not have sufficient time to demonstrate reasonable efforts, noting that Ms. Piro was assigned to the case only four months before the TPR trial, and that the Department failed to use reasonable efforts to assist Child in establishing a bond with Father. When making a determination as to whether the Department's efforts to assist Father were reasonable, however, the district court was required to "give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated." Section 32A-4-28(A); *see also Keon H.*, 2018-NMSC-

---

[4]Father also argues that he was "inexplicably required to attend classes and programs for anger management and participate in individual therapy[,]" and that the Department "failed to prove, by clear and convincing evidence, that the treatment plan, as drafted, was designed to ameliorate the conditions and causes of neglect." Father did not challenge the contents of his treatment plan at his adjudicatory hearing, and we decline to address such a challenge on appeal. *See* Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked.").

033, ¶ 52 ("When making a determination as to whether the [d]epartment's efforts to assist [the f]ather were reasonable, the district court was required to consider [the c]hild's health and safety."). As of the date of Father's TPR trial, Child had been in the custody of her foster parents for over two years, and Child's foster parents wished to adopt her. Moreover, the district court's paramount consideration was Child's health and safety. *See* NMSA 1978, § 32A-4-22(C) (2016) ("Reasonable efforts shall be made to preserve and reunify the family, with the paramount concern being the child's health and safety."). In this case, the district court found that Child was classified as a "Level 2 foster child" as a result of her special needs. Child's foster mom testified to the following: A "half-dozen" specialists follow Child for various medical, sensory, and mental health issues; Child has between five and ten medical appointments each month; Child has chronic sleep issues that require her foster parents to stay awake with her at night for up to four hours two to four times a week; Child has a diagnosis related to difficulty swallowing, which results in a heightened risk of choking and requires near constant attention from someone with knowledge of Child's medical needs; and Child's foster parents possess a specialized license to care for Child's ongoing needs.

**{23}** Dr. Alexander, an expert in clinical psychology, conducted a bonding study with Child and her foster parents and testified that Child's primary attachment is to her foster parents; two-years old is the most difficult time to introduce major change into a child's life; and introducing such change risked creating attachment and anxiety disorders that could have long-term consequences.

**{24}** To the extent Father argues Dr. Alexander's testimony is flawed because it relies on assumptions that Child's "perceived difficulty in bonding with Father trumps Father's fundamental interest in retaining custody of his biological child" and "that the harm caused to Child by transferring custody is unsurmountable[,]" we are unpersuaded. Dr. Alexander's testimony addressed the "paramount" concern of Child's health and safety, which included an assessment of Child's bonding with her foster parents and risks of removing Child from her foster parents. To the extent Father argues that, "if the [district court] is allowed to routinely extrapolate attachment theory to apply to the particular family before the court, then *all* biological parents would be prohibited from regaining custody[,]" we think this argument speculative. In fact, the district court stated that it gives "primary consideration to the needs of [C]hild" and found that Child "has special needs which require constant supervision[.]" And while Father cites *State ex rel. Child., Youth & Fams. Dep't v. Lance K.*, 2009-NMCA-054, ¶ 37, 146 N.M. 286, 209 P.3d 778, for the proposition that the "fact that a child might be better off in a different environment is not a basis for termination of parental rights[,]" Father does not explain how the district court's decision was based on such a comparison of two potential environments. *See Marsalee P.*, 2013-NMCA-062, ¶ 20 (recognizing that this Court does not review undeveloped arguments). As to Father's argument that, absent a showing of parental unfitness, the presumption is that the best interest of a child is to remain with her biological parents, as discussed, "parental unfitness is inherent in a finding . . . of [neglect or abandonment]." *In re Adoption of J.J.B.*, 1995-NMSC-026, ¶ 38.

**{25}** Importantly, in considering the totality of the circumstances and the level of cooperation demonstrated by the parent in determining whether the Department's efforts were reasonable, the district court took judicial notice of testimony indicating Father had notice he might be Child's biological father, yet concealed his identity when contacted by the Department several months before he was incarcerated rather than immediately seeking a paternity test, conceivably delaying the start of the Department's efforts. Specifically, Ms. Murphy testified at Father's adjudicatory hearing that in December 2019 or January 2020, she called a phone number she had received from probation and parole through her efforts to contact Father, whose name she had been given as a potential biological father. Upon calling the number, she spoke with a man who said his name was Matthew and stated he was not Timothy T.-L. When Ms. Murphy spoke with Father for the first time after a hearing in February 2020, Father confirmed the number Ms. Murphy had called was in fact his working phone number and informed Ms. Murphy he was the person who claimed to be Matthew. Ms. Murphy also testified that Father told her he had been aware of Child's case since October 2019, and was aware Child was in custody and could be his child, but that he wanted to catch up on bills and focus on his probation before getting involved with the Department. The district court found "[t]estimony was presented that [Father] avoided phone calls from the Department [and] denied his identity when speaking to the Department[.]"

**{26}** Moreover, Father's initial lack of certainty as to his paternity is not a defense to an adjudication of neglect by abandonment. *See State ex rel. Child., Youth & Fams. Dep't v. Michael H.*, 2018-NMCA-032, ¶ 34, 417 P.3d 1130 (concluding that a "lack of certainty of paternity is not a defense to an adjudication of neglect by abandonment[; t]hat is, such uncertainty will not constitute 'justifiable cause' for a man who is otherwise on notice that he may have fathered a child to fail to make provision for support of, and communicate with, the child"). Accordingly, we conclude clear and convincing evidence supports the district court's finding that the Department made reasonable efforts.

**E.    Clear and Convincing Evidence Supports the District Court's Finding That the Causes and Conditions of Neglect Were Unlikely to Change in the Foreseeable Future**

**{27}** Aside from a reasonable efforts determination, the district court was also required under Section 32A-4-28(B)(2) to determine whether the conditions and causes of the neglect and abuse were unlikely to change in the foreseeable future. "Foreseeable future" means "a reasonably definite time or within the near future." *Patricia H.*, 2002-NMCA-061, ¶ 34 (internal quotation marks and citation omitted). Father asserts he had ameliorated the causes of neglect by showing up and wanting custody of child and that the "only remaining impediment" was Father's incarceration, which cannot serve as the sole basis to terminate parental rights.

**{28}** While we recognize that incarceration is not a dispositive legal ground to terminate Father's parental rights, incarceration does not release Father from following treatment that affects his parental duties to Child. *See Hector C.*, 2008-NMCA-079, ¶

23, 144 N.M. 222, 185 P.3d 1072 ("[The f]ather fails to recognize his continuing duty to care for the children, regardless of his incarceration."). As discussed, the district court heard testimony that Child had significant medical needs requiring constant supervision, but that Father had failed to attend any of Child's medical appointments. The district court also heard testimony that Father failed to begin the Circle of Security program, a necessary condition to visitation with Child, and that creating a bond with Father would not happen in "a short period of time[.]" While Father argues that Dr. Alexander's testimony assumes the "harm caused to Child by transferring custody is insurmountable[,]" the district court stated that it gave "primary consideration to the needs of [C]hild[,]" who had been in the foster parents' custody for over two years at the time of the TPR trial. *See Patricia H.*, 2002-NMCA-061, ¶ 34 ("[I]n balancing the interests of the parents and children, the court is not required to place . . . children indefinitely in a legal holding pattern." (internal quotation marks and citation omitted)).

**{29}** Although we acknowledge Father's incarceration presented added difficulties to completing his treatment plan, these difficulties do not relieve Father from his treatment plan obligations. *See Nathan H.*, 2016-NMCA-043, ¶ 41 ("Although [the f]ather's repeated incarceration hindered the treatment plan, incarceration does not release [the f]ather from following treatment that affects his parental duties to [the c]hildren."). Accordingly, we conclude clear and convincing evidence supports the district court's finding that the causes and conditions of neglect were unlikely to change in the foreseeable future.

**F.    Clear and Convincing Evidence Supports the District Court's Finding That the Department Made Reasonable Efforts to Place Child With a Relative**

**{30}** Finally, Father argues the Department failed to show it made reasonable efforts to place Child with Father's mother (Grandmother). Section 32A-4-22(A)(6) provides that the district court shall make findings in its dispositional judgment as to "whether reasonable efforts have been made by the department to identify, locate and give notice to all grandparents and other relatives and to conduct home studies on any appropriate relative who expresses an interest in providing care for the child." *Accord* 8.10.7.18(C) NMAC (providing that the same determination be made at the permanency hearing "[i]f the court adopts a permanency plan other than reunification"); 8.10.7.17(C) NMAC.

**{31}** Father contends the Department and district court "took the position that Father was not entitled to a permanency hearing, and [that] neither Father nor Grandmother was entitled to exercise the option of Grandmother's becoming a placement source for the child[,]" which impermissibly led the district court to forego Father's opportunity for a relative placement merely because of his late entry into the case. Father asserts the district court "took the right of both Father and Child to maintain a family connection particularly lightly" and urges this Court to remand the case for a full consideration of relative placement. We are unpersuaded.

**{32}** To the extent Father argues the district court was required to reconsider Child's permanency plan after his entry into the case, Father cites no authority to support this proposition. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (stating that where a party cites no authority to support an argument, we may assume no such authority exists). We note, however, that Father's counsel was present at two permanency hearings but failed to object to Child's permanency plan, which remained adoption.

**{33}** To the extent Father argues he and Grandmother were denied the option to exercise Grandmother becoming a placement source, we disagree. Regarding the requirement that the district court determine whether the Department had made reasonable efforts in its dispositional judgment, *see* § 32A-4-22(A)(6), the district court heard testimony from Ms. Piro that Father's relatives had not contacted her. Ms. Piro also stated that she met with Father's previous PPW at a "transfer session" and was not made aware of any relatives who had tried to contact Father's previous PPW. *Cf. State ex rel. Child., Youth & Fams. Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 58, 366 P.3d 282 (concluding that the department's efforts were not reasonable in part because the PPW testified knowing that the child's relatives "were willing to have [the c]hild in the home"). Several weeks later, at a permanency hearing held days before the district court filed its dispositional judgment, Father's attorney requested that the Department look into placing Child with Grandmother and stated that Grandmother had been trying to contact the department and had expressed the intention of wishing to adopt Child. The Department's attorney responded that the Department had in fact been in contact with Grandmother, who only requested visitation, which the Department had arranged, but expressed no interest in becoming a licensed foster parent or adopting Child.

**{34}** Finally, Child had already been in custody for approximately eighteen months by the time Father was served with an abuse and neglect petition, and the court heard evidence that Father actively avoided engaging with the Department before being served, conceivably delaying the Department's ability to identify Father's relatives as possible placement sources. *See State ex rel. Child., Youth & Fams. Dep't v. Laura J.*, 2013-NMCA-057, ¶ 50, 301 P.3d 860 ("What constitutes 'reasonable efforts' varies with the . . . circumstances of each case."). Accordingly, we conclude clear and convincing evidence supports the district court's finding that the Department made reasonable efforts to place Child with a relative.

**CONCLUSION**

**{35}** Based on the foregoing, we vacate the district court's determination that the Department met its burden under 32A-4-28(B)(1) but otherwise affirm.

**{36}  IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**JACQUELINE R. MEDINA, Judge**